Paulo ARRUDA, Plaintiff, Appellant,

v.

Michael V. FAIR, Etc., et al.,
Defendants, Appellees.

No. 82–1827.

United States Court of Appeals,
First Circuit.

Argued March 11, 1983.

Decided June 29, 1983.

David S. Godkin, Boston, Mass., with whom Robert D. Keefe, Merriann M. Panarella, and Hale & Dorr, Boston, Mass., were on brief, for plaintiff, appellant.

Michael C. Donahue, Sp. Asst. Atty. Gen., Boston, Mass., with whom Sheridan, Garrahan & Lander, Framingham, Mass., was on brief, for defendants, appellees.

Before COFFIN, Chief Judge, BREYER, Circuit Judge, and MALETZ,* Senior Judge.

BREYER, Circuit Judge.

The appellant, Paulo Arruda, is an inmate in a special maximum security unit within MCI-Walpole, a Massachusetts maximum security prison. He challenges the prison's policy of strip-searching inmates of the security unit in two particular instances: when they enter or leave the unit on their way to or from the prison law library and infirmary, and after they receive visitors in the unit's visiting rooms. After conducting an extensive hearing where the conditions at the prison were explored in detail, the district court, 547 F.Supp. 1324, held that the searches in question did not violate the Fourth or Eighth Amendments and did not deprive Arruda of his constitutionally protected access to the courts. We find no error.

The Supreme Court's opinion in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), governs our approach to this appeal. In *Wolfish,* the Supreme Court assumed—and we have held, *see United States v. Chamorro,* 687 F.2d 1, 4 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982)—that prison inmates retain some measure of Fourth Amendment rights. The Court stated that the ultimate

* Of the United States Court of International Trade, sitting by designation.

Fourth Amendment question is whether a prison search policy is "reasonable" under the circumstances. The Court wrote that to answer this question requires a balancing of interests; courts "must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." 441 U.S. at 559, 99 S.Ct. at 1884. The Court indicated that a court engaged in this balancing must evaluate "prison practice . . . in light of the central objective of prison administration, safeguarding institutional security," and that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 547, 99 S.Ct. at 1878. The Court specifically upheld as constitutional a prison strip search policy that required all inmates "to expose their body cavities for visual inspection . . . after every contact visit with a person from outside the institution." Id. at 558, 99 S.Ct. at 1884. In so doing, it reversed decisions by a federal district court and a court of appeals to the contrary. Since Wolfish, most lower courts have also upheld the validity of prison strip searches, see, e.g., United States v. York, 578 F.2d 1036 (5th Cir.), cert. denied, 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682 (1978); United States v. Lilly, 576 F.2d 1240 (5th Cir.1978); Brown v. Hilton, 492 F.Supp. 771 (D.N.J. 1980); Lee v. Downs, 470 F.Supp. 188 (E.D. Va.1979), although a few have not, see Frazier v. Ward, 528 F.Supp. 80 (N.D.N.Y. 1982); Sims v. Brierton, 500 F.Supp. 813 (N.D.Ill.1980); Hodges v. Klein, 412 F.Supp. 896 (D.N.J.1976).

We recognize, as have all courts that have considered the issue, the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities. This practice "instinctively" gave the Supreme Court "the most pause" in Wolfish, 441 U.S. at 558, 99 S.Ct. at 1884, and understandably so. However, there is nothing in the record here that indicates that the strip searches were conducted in a more intrusive or demeaning fashion than those in Wolfish. If there are any constitutionally significant differences between this case and Wolfish, they lie on the other side of the balance, in the relative security needs of the institutions. And it is here that Wolfish cautions us to be most hesitant to overturn prison administrators' good faith judgments.

Admittedly, there are characteristics of this case that reasonably allow Arruda to argue that we should distinguish it from Wolfish in terms of security needs. For one thing, the prisoners in Wolfish were searched on their return from a visitors' room where prisoners and visitors, although observed by a guard throughout the visit, were not separated by a screen. Here, the visiting rooms are divided by a wire security screen. For another thing, unlike Wolfish, the prisoners here are searched on their way from their cells to the prison library and infirmary, as well as on their return, despite the fact that guards accompany them on these visits. There are other, less important distinctions as well.

Nonetheless, there are other facts about this case that suggest that these searches are more, not less, reasonable than those in Wolfish. First, MCI–Walpole itself is a maximum security facility, the only such institution in Massachusetts, designed to hold those inmates who pose the greatest risks to society and to each other. In 1982, 76 percent of its inmates were confined for crimes against the person; 55 percent had six or more prior charges for such crimes; and 83 percent were serving maximum sentences of more than 10 years. The New York prison in Wolfish was not such a place. Second, the special security area, known as the DSU or Block 10, is a "prison within a prison," designed to hold the most dangerous inmates—those "whose continued retention in the general institution population is detrimental to the program of the institution." Mass.Gen.Laws ch. 127, § 39. Arruda was confined to the DSU for assaulting a prisoner. The strip searches in Wolfish were not restricted to particularly dangerous prisoners; they were made of

ordinary inmates, including pretrial detainees—persons who had not yet even been convicted of a crime. Third, the record here bears out a lengthy history of prison contraband problems, including prisoner possession of both drugs and weapons. Arruda testified that while he was a member of the general prison population, he himself possessed drugs and a weapon. Fourth, the record suggests that in at least eight instances, guards themselves were found to have been involved in smuggling contraband, including drugs, to prisoners. Those who were caught were dismissed, but the contraband problem continues. The opinions of the several courts in *Wolfish* are silent on this score.

Finally, unlike the Supreme Court in *Wolfish,* we have before us a lower court decision, made after a hearing, in which the court found that the strip search policy *was* reasonable under the circumstances. Having reviewed the record we find the district court within its rights in concluding the following. First, the prison administrators could reasonably believe that without strip searches they would face a risk of more contraband in the hands of their most dangerous prisoners. Despite screens in the visiting rooms, contraband could still be passed through the screens; despite the presence of guards, a prisoner might obtain contraband from another person at the library or in the infirmary. The closest question in our minds is whether there is a need to search the prisoners when they leave their cells on the way to the library or infirmary. Yet, given the problem of prison employee involvement with contraband, the district court's conclusion is not unreasonable: Despite the prisoner's relative isolation, someone, such as an untrustworthy prison employee, might place contraband in a cell at night for the prisoner to pass to others on his next library or infirmary visit. Second, while alternative methods of dealing with the contraband problem may exist, such as totally screening off visitors, more thoroughly searching the visitors themselves, and further restricting trips by prisoners to areas outside the DSU, each such alternative has significant costs of its own

in terms of both privacy and other significant interests. And, the record reveals that the prison authorities took alternatives and their costs into account.

Under these circumstances, we do not believe that the factual distinctions to which Arruda points are sufficient to allow us to depart from the Supreme Court's result. The injury to privacy interests is virtually identical; the "security needs" justification, in our view, is equally plausible. We have reviewed the record recognizing our obligation to overturn factually based conclusions only when "clearly erroneous," Fed.R.Civ.P. 52(a), and our obligation to apply the precedent of *Wolfish* and the principles it sets forth. Applying these standards, we find no basis for reversal on the Fourth Amendment claim. And the standards imposed by the Eighth Amendment ("cruel and unusual punishment") are no more lenient. The record does not reveal any separate or sufficient basis for overturning the district court's rejection of the "right of judicial access" claim. The decision of the district court is therefore

*Affirmed.*

MALETZ, Senior Judge, concurring in part and dissenting in part:

To the extent the majority find routine strip searches permissible after visits with persons from outside the prison community, I agree. *See Bell v. Wolfish,* 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979). At the same time, however, I find strip searches routinely conducted before and after intraprison transfers constitutionally impermissible. I must, therefore, dissent from that portion of the majority's opinion.

The most troubling aspect of this case is routine strip searches conducted before and after trips to the prison hospital and library. The bottom line rationale for strip searches in those instances appears to be based on the facility's seeming inability to adequately control its own staff. Frankly, I am hard-pressed to see why this situation should inure to the detriment of the prison-

er. Such a justification for routine strip searches leaves prison authorities with virtually unlimited discretion in this field. It is a mere makeweight for explaining away any intrusion into a prisoner's privacy interests, concededly limited though they may be.

I am mindful of the Supreme Court's admonition in *Wolfish* that reviewing courts not "second-guess" prison administrators. Our sole inquiry is, rather, whether the practice or condition violates the Constitution. For there must be some limits to the level of deference a court is to accord prison administrators. Otherwise their discretion in this area would be nothing short of unbridled and we would be, at the same time, abnegating our supervisory responsibility. On this score, we are reminded that "convicted persons do not forfeit all constitutional protections by reason of their conviction and confinement in prison," including the limited protection of the fourth amendment's prohibition against unreasonable searches. *Wolfish*, 441 U.S. at 545, 558, 99 S.Ct. at 1879, 1884; *United States v. Chamorro*, 687 F.2d 1, 4 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982).

In determining the lawfulness of a strip search—a practice which, as the majority correctly point out, "instinctively" gave the Supreme Court the "most pause" in *Wolfish,* 441 U.S. at 558, 99 S.Ct. at 1884—the need for the particular search must be balanced against the invasion of personal rights that the search entails. To this end, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for it, and the place in which it is conducted." *Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884.

First, as to the scope of the particular intrusion here, each and every time appellant leaves and returns to his cell, whether it be to see a visitor, to use the prison library, to exercise, or to visit the prison hospital—regardless of whether there is even a suspicion that he is concealing contraband—he is submitted to a visual strip search. Appellant is accompanied by two guards on each of these trips and is shackled both to and from his cell. As a Departmental Segregation Unit (DSU) resident appellant is not permitted to come into contact with other inmates. Only one DSU resident is released from his cell to the cell corridor at any one time.

The strip search is not conducted in private, but provided appellant cooperates by following the strip search procedures, there is no physical contact between appellant and the guards during the course of the strip search.

The justification for the strip search appears to be premised in large part on the place in which it is conducted. Given that the MCI-Walpole facility has a violent prisoner population, and that the DSU houses the most violent of these prisoners, the state submits that security considerations necessitate the strip search policy employed here. While conceding that inmates housed in the DSU are under the tightest security, the state contends that opportunities for receipt of contraband still exist through the guards. The facility apparently has had a history of being unable to control them in this regard.

I do not dispute that MCI-Walpole has had a history of violence, and that the introduction of contraband has been a major problem. Nevertheless, the district court found that *visitors* are the major source of contraband at MCI-Walpole. While this finding would support routine strip searches in the visitor context, it totally fails to answer the question why routine strip searches should be tolerated in other settings. Therefore, to the extent that the state cites its incorrigible guards as the justification for all other strip searches, this seems no rationale at all here. *Hurley v. Ward,* 549 F.Supp. 174, 186 (S.D.N.Y.1982).[1]

Against this background, balancing the security interests of the institution in con-

1. The district court found that some contraband had been brought into the institution by staff. Significantly, however, strip searches of

DSU inmates are not required after they have had staff contacts.

ducting routine visual strip searches of appellant against the serious intrusion on his privacy interests occasioned by such a search, I am constrained to conclude that routine visual strip searches before and after visits to the prison library and prison hospital are unreasonable, absent some level of cause, such as reasonable suspicion, *see Wolfish*, 441 U.S. at 563, 99 S.Ct. at 1886 (Powell, J., dissenting), or a "clear indication" that contraband is being secreted on an inmate's person. *See Schmerber v. California*, 384 U.S. 757, 769–70, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966).

In this regard I feel that the majority's opinion in *Wolfish* is distinguishable. There, the Court noted that the searches were conducted after contact visits that apparently were not closely monitored by prison officials. The searches were thus, in the Court's judgment, necessary to check the *introduction* of contraband into the MCC. *Id.* at 559, 99 S.Ct. at 1884. The *Wolfish* holding is therefore not controlling with respect to internal prison searches that serve only to detect the *circulation* of contraband that has already been introduced into the facility. Moreover, *Wolfish* did not foreclose possible constitutional limitations on the power of prison officials to conduct body searches.

I believe that the border search cases provide a useful analytical framework for prison searches. The sliding scale of reasonableness adopted in the border search area shows that there exists a middle ground between, on the one hand, saddling the government with an unrealistically high standard of proof, such as probable cause, and, on the other, allowing officials unfettered discretion to conduct this type of surveillance. Like prison searches, customs inspections implicate very powerful government interests in the detection of contraband and may entail significant intrusion into the privacy rights of the individual searched. While there are, of course, differences between the two situations that

preclude a wholesale transposition of standards, it is at least possible to look to border search cases for guidance in evaluating prison searches. *See* Note, *Constitutional Limitations on Body Searches in Prison*, 82 Colum.L.Rev. 1033, 1048–49 (1982).

Instructive in this connection is *Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976). While upholding strip searches following visits with friends and relatives in order to prevent the introduction of contraband into the prison community, the court found unreasonable routine strip searches following the movement of an inmate within the institution:

> To the extent that the state's interest in controlling intra-prison transfer of contraband justifies an anal examination . . . , the court concludes that the residuum of Fourth Amendment protection through which a prisoner retains an interest in privacy prevents the imposition of this degrading and humiliating search . . . .

*Id.* at 902. Analogizing the role of the prison guard with that of the customs officer, the court in *Hodges*, relying on border search cases, concluded that the state cannot conduct a visual anal search of an inmate "unless there is a reasonably clear indication or suggestion that the inmate is concealing something in his anal cavity." *Id.* at 903.

In analyzing the adequacy of the state's justification for strip searches here, the state's interest in preventing the influx of contraband in prison cannot be gainsaid. On this score strip searches following visits with friends, relatives or attorneys are justified on balance. Government security interests are strongest with respect to those searches aimed at preventing contraband from getting into the prison. *See Hurley v. Ward*, 584 F.2d 609, 611 (2d Cir.1978).[2] Contraband that is successfully smuggled past the prison threshold may be used or consumed almost immediately thereafter. The point-of-entry search may thus offer

---

**2.** This assumes, of course, that prison staff are not the source of contraband, an institutional problem which, as previously indicated, cannot

be proffered as an acceptable justification for routinely subjecting inmates to strip searches.

officials their only opportunity to detect certain contraband and prevent its use.

By contrast, internal searches conducted to curtail the circulation of contraband within a prison implicate far less compelling security interests than do point-of-entry searches. With internal searches, prison authorities do not block the introduction of contraband—they merely deter and detect its circulation. When one of the primary justifications for strip searches in these circumstances rests on the institution's inability to control its own staff the scales tip decidedly in favor of the inmate. Given the extremely tight security placed around a DSU inmate generally and especially during his visits to and from the prison library and hospital, routine strip searches in those two situations would appear to violate the fourth amendment, absent some individualizing indicia of suspicion. *Hurley v. Ward,* 584 F.2d at 611 (routine strip search of inmate who was "heavily shackled and under close and constant guard during the few excursions from his segregated cell" was unnecessary and unjustified); *Hodges v. Klein, supra. See also Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Tinetti v. Wittke,* 620 F.2d 160 (7th Cir.1980).

Accordingly, I concur in the majority's opinion to the extent it upholds the practice of routine strip searches of DSU inmates following visits with persons from outside the facility. In all other respects, I respectfully dissent.