# United States Court of Appeals
## For the First Circuit

No. 00-1752

CRAIG L. ROBERTS, SR.,

Plaintiff, Appellee,

v.

STATE OF RHODE ISLAND, GEORGE VOSE, IN HIS CAPACITY
AS DIRECTOR OF THE RHODE ISLAND
DEPARTMENT OF CORRECTIONS,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

---

Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Saris,* District Judge.

---

Rebecca Tedford Partington, Assistant Attorney General, with whom Sheldon Whitehouse, Attorney General, was on brief, for appellants.
    Gregory A. Bölzle, with whom Brown, Todd & Heyburn, PLLC and Thomas W. Kelly, were on brief, for appellee.

---

* Of the District of Massachusetts, sitting by designation.

February 13, 2001

**TORRUELLA, Chief Judge.** Two Rhode Island Department of Corrections ("DOC") policies provide that all males committed to the state prison be subject to a strip search and a visual body cavity search[1] upon incarceration as a matter of routine procedure. Appellee Craig Roberts challenged these policies as unconstitutional. The district court agreed that the policies were unconstitutional, holding that this Court's decision in Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997), required that corrections officers have a reasonable suspicion that an individual was concealing contraband prior to conducting a strip and visual body cavity search. Roberts v. Rhode Island, No. 99-259ML, slip op. at 13-17 (D.R.I. March 16, 2000). Rhode Island now appeals. Because we find that the Rhode Island policy does not meet the reasonableness test of Bell v. Wolfish, 441 U.S. 520, 559 (1979), we affirm the holding of the district court.

## BACKGROUND

On April 20, 1999, Roberts was a passenger in a car stopped for expired registration stickers. After a computer check revealed that Roberts was the subject of an "outstanding body attachment,"[2] the

---

[1] A "strip search" involves a visual inspection of the naked body of an inmate. A "visual body cavity search" is a strip search that includes the visual examination of the anal and genital areas. Security & Law Enforcement Employees v. Carey, 737 F.2d 187, 192 (2d Cir. 1984).

[2] Under R.I. Gen. Laws § 8-10-3.1(c)(8), a magistrate has the power to issue a "body attachment" upon the failure of a party to appear for a judicial proceeding. Such a writ allows officers to take the defendant

-3-

officers performed a pat-down frisk and placed him in custody. Although Roberts produced a September 1, 1998 order withdrawing the attachment, he was not released. Instead, he was transported to the Intake Services Center ("Intake") at the Adult Correctional Institution ("ACI") in Cranston, Rhode Island.

Upon reaching Intake, Roberts was photographed, fingerprinted, and asked to submit to a blood test, which he refused. Officers then performed a strip search and visual bodily cavity search, pursuant to two DOC policies.[3] As part of the search, corrections

into custody if the family court is not in session. See Roberts, slip. op. at 3.

[3] The first policy, Operational Memorandum 5.15.05-2 Part V.B. (dated June 15, 1984), provides (in relevant part) that:

Each new commitment's person, clothing, and personal belongings shall be thoroughly searched for contraband.

1. The commitment officer shall thoroughly search the inmate's body to include examination of hair, arms, hands, ears, mouth, nose; visual examination of groin and rectum; toes and soles of feet.

(a) Any artificial limbs, dentures, or bandages shall be carefully examined.

2. The new commitment's clothing and belongings shall be thoroughly searched to include examination of all pockets, cuffs, seams, hat bands, waistbands, zippers, and collars; all clothing shall be turned inside-out and linings checked; soles, heels, socks, and inside of all shoes shall be examined; the contents of any and all luggage, packages, bags, etc. shall be thoroughly examined.

The second policy, Policy and Procedure 9.14-1 Part III.B.2. (dated January 27, 1997), provides that:

officers inspected the inside of Roberts' mouth and nose and the soles

of his feet.  Roberts was also ordered to spread his buttocks, at which

time officers visually inspected his body cavity.  At no time during

---

a. Strip searches of inmates will always be conducted for objective purposes only and will always be carried out in an expeditious and efficient manner.  They will never be done for punitive purposes or as a form of harassment.

(1) Strip searches shall be conducted under the direction of the Shift Supervisor or other Superior Officer, or as required by policy.

(2) Two Correctional Officers shall be assigned to conduct a strip search.

(3) Strip searches shall be conducted by officers of the same sex as the inmates being searched, except during emergencies.

(4) The following search plan shall be followed when conducting a strip search.  The officer will examine:

> (a) All pockets;
> (b) Run fingers over linings, seams, collars, cuffs, waistbands and fly;
> (c) Shoes, inside soles and heels;
> (d) Socks, turning them inside out;
> (e) False teeth, artificial limbs, plaster casts;
> (f) Inmates will run their fingers through their hair. Officers will check for wigs and hairpieces;
> (g) Inmates ears [sic] will be checked inside and out;
> (h) The officer will look inside the inmate's nose;
> (i) Inmates will open their mouths, lift their tongues, and roll each lip, for the officer's view;
> (j) Inmates will lift their penises and testicles on the officer's command to provide a clear view of the groin area;
> (k) Inmates will then lift their feet so that the officer can clearly see between the toes and the soles;
> (l) Inmate's hands will be visually inspected;
> (m) Inmates will be required to bend over and spread the rectum to provide a clear view of the area.

the search did an officer touch Roberts. No contraband was found on Roberts' person. Roberts was subjected to a second similar search the same day before being transferred and ultimately released from police custody.

Appellants argue that the strip and visual body cavity search is necessary because of the unique nature of the Intake facility. Unlike many jurisdictions, Rhode Island does not have regional facilities to house pretrial detainees prior to trial and sentencing. Intake acts as the receiving facility for all male inmates committed to the care and custody of the DOC, including those arrested on an outstanding warrant, ordered held without bail, or unable to post bail.[4] Because Rhode Island has a unified prison system, pretrial detainees held at Intake mix with the general prison population. Intake is itself considered a maximum security prison.

## DISCUSSION

Both convicted prisoners and pretrial detainees retain constitutional rights despite their incarceration, including basic Fourth Amendment rights against unreasonable searches and seizures. Bell, 441 U.S. at 545. However, those rights may be subject to restrictions and limitations based on the fact of confinement, the legitimate goals and policies of the penal institution, and the need of

---

[4] No inmate is sent to Intake without judicial authority, i.e., without an outstanding warrant or other judicial action. Most arrestees charged with minor offenses are committed briefly to local jails.

-6-

the institution to maintain security and internal order. Id. at 545-46. "When an institutional restriction infringes a specific constitutional guarantee," - here, the Fourth Amendment right against unreasonable searches, - "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Id. at 546. This evaluation is a deferential one, giving due regard to the "professional expertise of corrections officials," id. at 548 (citing Pell v. Procunier, 417 U.S. 817, 827 (1974)), and the limited role of the judiciary in operating and supervising correctional facilities, see id. (citing Procunier v. Martínez, 416 U.S. 396, 405 (1974)).

In Bell, the Supreme Court specifically addressed a strip and visual body cavity search conducted of all inmates after every contact with an outside visitor. Id. at 558. Although the Court admitted that the practice of examining inmates' body cavities "instinctively [gave it] the most pause," the Court upheld the search. Id. In determining that the search was reasonable, the Court balanced "the need for the particular search against the invasion of personal rights that the search entails." Id. at 559. More specifically, the Court instructed courts to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. After weighing these considerations, the Court found that "visual body cavity searches [in

-7-

the prison context] can 'be conducted on less than probable cause.'"
Swain, 117 F.3d at 6 (quoting Bell, 441 U.S. at 560).

This Court held in Swain that, at least in the context of prisoners held in local jails for minor offenses, the Bell balance requires officers to have a reasonable suspicion that a particular detainee harbors contraband prior to conducting a strip or visual body cavity search. Swain, 117 F.3d at 7. Appellants argue that the heightened security concerns of the Intake facility allow for per se searches of committed inmates even absent individualized suspicion. Appellants also suggest that the requirement of judicial intervention (i.e., either an outstanding warrant or a judicial order) to commit an inmate to Intake changes the Bell calculation. We reconsider the Bell factors in light of these distinctions to determine if the Rhode Island policies are unreasonable searches prohibited by the Fourth Amendment.

We begin with the "scope of the particular intrusion." Bell, 441 U.S. at 559. In Swain, we recognized that visual body cavity searches "impinge seriously upon" Fourth Amendment values. 117 F.3d at 7. We had previously termed such searches a "severe if not gross interference with a person's privacy." Arruda v. Fair, 710 F.2d 886, 887 (1st Cir. 1983). And although our language has not been as strident as that of the Seventh Circuit, see Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983) (describing such searches as, among other things, "demeaning, dehumanizing, undignified,

embarrassing and repulsive"), we consider such searches an "extreme intrusion" on personal privacy and "an offense to the dignity of the individual," Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996). The search required by Rhode Island DOC policy is no exception: although Roberts was admittedly not touched by corrections officials, he was forced to display his genitals, as well as to spread his legs so that officials could observe his body cavity.

We next turn to the government interest at stake here, that is, the "justification for initiating" the search. Bell, 441 U.S. at 559. In this case, that interest is primarily a concern for institutional security. This Court has recognized that institutional security is a legitimate need of law enforcement, and may provide a compelling reason for a warrantless strip search absent reasonable suspicion of individual wrongdoing. Swain, 117 F.3d at 7. Indeed, in Bell, the Supreme Court allowed searches of all inmates who had entertained visitors, even if there was no suspicion that an individual inmate had received contraband from a visitor. In Arruda, we upheld a search of all inmates returning from the law library and infirmary, as well as those inmates receiving visitors. 710 F.2d at 888. We focused on the fact that the prison was a maximum-security one, that the inmate in question had been confined to a "special security area" for particularly dangerous inmates, and that the "record [contained] a lengthy history of prison contraband problems." Id. In contrast, we

-9-

were unconvinced by institutional security concerns in Swain, because the arrestee there was held in a local jail and posed "no risk" of contact with other prisoners.  117 F.3d at 8.

The institutional security concerns in play here fall somewhere between those exhibited in Swain, which were insufficient to support a search, and those in Arruda and Bell, which made broad-based searches without individual suspicion reasonable.  For the reasons detailed below, we think that the Rhode Island policies fall on the Swain side of the constitutional line.

First, unlike in Bell or Arruda, Rhode Island does not limit its searches to prisoners who have had contact with outside visitors. Courts have given prisons far more leeway in conducting searches of inmates with outside contact than in searching everyone, simply because such visits often allow smuggling of contraband.  See Bell, 441 U.S. at 558; Masters v. Crouch, 872 F.2d 1248, 1253 (6th Cir. 1989) (citing the "obvious risk" that visits may be used to introduce contraband); Arruda, 710 F.2d at 888.  Although inmates such as Roberts certainly have the opportunity to introduce contraband to the prison, and may have even done so in the past, it is far less likely that smuggling of contraband will occur subsequent to an arrest (when the detainee is normally in handcuffed custody) than during a contact visit that may have been arranged solely for the purpose of introducing contraband to the prison population.  Furthermore, after an arrest the Rhode Island

authorities should be able to detect contraband on the person of a detainee without the need for a body cavity inspection.  In addition, the deterrent rationale for the Bell search is simply less relevant given the essentially unplanned nature of an arrest and subsequent incarceration.  See Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984).

Second, although the Intake facility is maximum security, it is not a "prison within a prison" like that where Arruda was held. Arruda, 710 F.2d at 887.  Prison officials had no reason to believe that Roberts was one of the "most dangerous inmates . . . whose continued retention in the general institution population is detrimental to the program of the institution," id. at 887 (quoting Mass. Gen. Laws ch. 127 § 39), nor did Rhode Island differentiate its search to focus on such inmates.  Unlike in Arruda, everyone at Intake was searched upon admission to the facility.  While it is a reasonable approach to safeguarding institutional security to engage in extra efforts to ensure that the most dangerous inmates do not have access to weapons or contraband, the extension of the intrusion to far less dangerous inmates (such as Roberts) is a severe incursion on privacy frowned upon by the Bell balancing test.  The fact that it requires some type of judicial order for an inmate to be committed to Intake does not change this assessment: the temporary incarceration of Roberts for his failure to appear indicates that both highly dangerous and

-11-

relatively harmless offenders may be incarcerated with judicial approval.[5]

Third, courts have given prisons latitude to premise searches on the type of crime for which an inmate is convicted or arrested. The reasonable suspicion standard may be met simply by the fact that the inmate was charged with a violent felony. See Dufrin v. Spreen, 712 F.2d 1084, 1087 (6th Cir. 1983). However, when the inmate has been charged with only a misdemeanor involving minor offenses or traffic violations, crimes not generally associated with weapons or contraband, courts have required that officers have a reasonable suspicion that the individual inmate is concealing contraband. See Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986) (misdemeanors); Stewart v. County of Lubbock, 767 F.2d 153, 156-57 (5th Cir. 1985) (misdemeanors); Giles, 746 F.2d at 617 (traffic violations and other minor offenses); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984) (traffic violations); Mary Beth G., 723 F.2d at 1272-73 (misdemeanors); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (DWI). Roberts was picked up on an outstanding warrant from a family court; no evidence was adduced to indicate that his offense was the type normally associated with weapons or contraband. Moreover, Rhode Island has made no effort to engage in

---

[5] Moreover, this assessment does not even account for the fact that in Roberts' specific case, the body attachment had been revoked and his incarceration was apparently unwarranted.

this sort of particularized approach, preferring to search all entrants to Intake.

Fourth, a policy of searching all inmates is more reasonable when the record indicates a "lengthy history of contraband problems." Arruda, 710 F.2d at 887. Although the record here does indicate a lengthy history of contraband problems, a close examination of that record indicates that a body cavity search was (with possibly one exception) entirely unnecessary to discover that contraband.[6] Cf. Mary Beth G., 723 F.2d at 1272-73 (only a few items recovered from body cavities). The lack of specific instances where a body cavity search was necessary to discover contraband supports a finding that the policy of searching all inmates is an unreasonable one. Furthermore, the record indicates that less invasive (and less constitutionally problematic) searches would have been equally as effective in revealing contraband. For example, lacking reasonable suspicion that an individual is hiding contraband, Rhode Island could still search that person's clothes, a far less intrusive procedure than a full-scale strip and body cavity search. See id. at 1271.

---

[6] Attached to the Affidavit of A. T. Wall II, the Interim Director of the Rhode Island DOC, are numerous incident reports of contraband discovery during the Intake admission process. With only one exception (where the inmate had hidden cocaine in his mouth), all the contraband was found in the inmate's clothing. Appellants have adduced no evidence of contraband that would not have been discovered without the visual body cavity search.

In short, although appellants have cited "institutional security" as a sufficient reason not to require reasonable suspicion for inmate body cavity searches, their only justification for this severe invasion is that Intake is a maximum security facility where arrestees mingle with the general population. Intermingling of inmates is a serious security concern that weighs in favor of the reasonableness, and constitutionality, of the search. See Dobrowolskyj v. Jefferson County, 823 F.2d 955, 959 (6th Cir. 1987) (upholding "a more narrowly drawn policy" of searching those to be moved into the general jail population); Dufrin, 712 F.2d at 1087 (inmate would come into contact with general population); Logan, 660 F.2d at 1013 (noting lack of intermingling). Several courts, however, have held that intermingling alone is insufficient to justify a search without reasonable suspicion. Chapman v. Nichols, 989 F.2d 393, 396 (10th Cir. 1993); Masters, 872 F.2d at 1254. Another has noted that intermingling is a dubious reason for a strip search because it is inherently "limited and avoidable." Giles, 746 F.2d at 619 (citing Smith v. Montgomery County, 547 F. Supp. 592, 598-99 (D. Md. 1982)). We agree with these courts that the unified nature of the Rhode Island prison system is not, in itself, dispositive of the reasonableness of the search. To place so much weight on one (potentially alterable) characteristic of the state prison system would gut the balancing

approach endorsed by the Supreme Court in <u>Bell</u> and applied by this Court in <u>Swain</u> and <u>Arruda</u>.

The <u>Bell</u> balancing test also instructs us to consider the place in which the search is conducted and the manner in which it is conducted. 441 U.S. at 559. Neither aspect of this search is problematic. The policy requires the search to be conducted by officers of the same sex of the inmate. It appears from the record that the search is generally conducted in private.[7] Moreover, the search is entirely visual and there have been no accusations of abuse. Given the intrusive nature of a strip and visual body cavity search, Rhode Island has endeavored to perform these searches in a relatively private manner. <u>See</u> <u>Justice</u> v. <u>City of Peachtree City</u>, 961 F.2d 188, 193 (11th Cir. 1992).

**CONCLUSION**

"<u>Bell</u> has not been read as holding that the security interests of a detention facility will always outweigh the privacy interests of the detainees." <u>Dobrowolskyj</u>, 823 F.2d at 957. Our previous decisions have also indicated that the Fourth Amendment balance cannot be shifted so quickly. <u>See</u> <u>Swain</u>, 117 F.3d at 7-8. This is not to say that prison officials are hamstrung in their efforts to protect the security of penal institutions. Both the Supreme Court

---

[7] The DOC policy provides for searches to be "conducted in a private area, away from public view."

-15-

in Bell and this Court in Arruda have suggested that an individualized reasonable suspicion is not necessary to search certain groups of inmates, such as those who receive visitors; other circuits have suggested that broad-based strip search policies may be appropriate in other circumstances. See, e.g., Giles, 746 F.2d at 617. Of course, officers may meet the reasonable suspicion standard based on their observations of a particular inmate during a less invasive pat-down frisk and clothing search, or based on contraband found during that search. However, "[a]n indiscriminate strip search policy routinely applied . . . can not be justified simply on the basis of administrative ease in attending to security considerations." Logan, 660 F.2d at 1013. Standing alone, the security concerns of the Intake facility cannot support the search policy here as it applies to minor offenses. The policy is unconstitutional under the Fourth Amendment.

**Affirmed.**