Geoffrey V.V. WOOD, Plaintiff

v.

HANCOCK COUNTY,
et al., Defendants

No. Civ.02–69–B–S.

United States District Court,
D. Maine.

Feb. 12, 2003.

Sandra Hylander Collier, Ellsworth, ME, for Geoffrey V.V. Wood.

Peter T. Marchesi, Wheeler & Arey, P.A., Waterville., ME, for County of Hancock, Hancock County Sheriff, Linda Hannan.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

SINGAL, District Judge.

The United States Magistrate Judge filed with the Court on January 7, 2003 her Recommended Decision. Defendants filed their objections to the Recommended Decision on January 29, 2003. Plaintiff responded to Defendants' objections on February 10, 2003. I have reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, and determine that no further proceeding is necessary.

1. It is therefore *ORDERED* that the Recommended Decision of the Magistrate Judge is hereby *AFFIRMED*.
2. It is further *ORDERED* that Defendants' Motion for Summary Judgment is *DENIED*.
3. It is further *ORDERED* that Defendants' Motion for Judgment on the Pleadings is *DENIED*.

## RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT

KRAVCHUK, United States Magistrate Judge.

Geoffrey Wood was taken into custody at the Hancock County Jail on May 27, 2001, and July 10, 2001, on domestic assault related charges. In this civil rights action he asserts that he was subjected to strip searches during his two detentions in contravention of his rights under the Fourth, Fifth, Sixth,[1] and Fourteenth Amendments of the United States Constitution. (Docket No. 1.) Wood seeks remedy from Hancock County as well as Hancock County Sheriff William Clark and Hancock County Jail Administrator Linda Hannan in their official capacity on the theory that the impermissible searches were the result of a policy or custom of which the defendants knew or should have known. Before me is the defendants' motion for judgment on the pleadings or, in the alternative, summary judgment (Docket Nos. 6 & 7), to which Wood has responded (Docket Nos. 14 & 15). I also address the defendants' motion to strike certain paragraphs of Wood's statements of material fact and one paragraph of Wood's affidavit. (Docket No. 21.) Though I agree with some of the points

---

1. Wood's claims under the Fifth and Sixth Amendment are not addressed by either side. I have analyzed the case as a Fourth/Fourteenth Amendment case, as have they.

raised in the defendants' motion to strike, I conclude that it is unnecessary to strike any portions of Wood's pleadings and therefore **DENY** the motion. I have addressed the pertinent issues raised by the motion to strike while discussing the summary judgment motion. Based on the reasons offered below I recommend that the Court **DENY** the motion for summary judgment.

### Discussion

### Motion for Judgment on the Pleadings

■ The defendants seek dismissal of the complaint under Federal Rule of Civil Procedure 12(c) for failure to state a claim. I conclude that the defendants are not entitled to judgment on the pleadings. The allegations of Wood's complaint are sufficient to state a claim under 42 U.S.C. § 1983. *See generally Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512–13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). I recommend that the court **DENY** the motion for judgment on the pleadings.

### Summary Judgment Standard

The defendants are entitled to summary judgment only if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact," Fed R. Civ. P. 56(c), and they are "entitled to a judgment as a matter of law," *id.* For his part, Wood "has a threshold burden to 'set forth specific facts showing that there is a genuine issue for trial.'" *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1512 (1st Cir.1989) (quoting Federal Rule of Civil Procedure 56(e)).

*See also* D. Me. Loc. R. Civ. P. 56(c),(e). In evaluating whether a genuine issue is raised, I view all facts in the light most favorable to Wood and give him, as non-movant the benefit of all reasonable inferences in his favor. *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000).

### Material Facts

### A. The Showers and Searches

Wood was arrested on May 27, 2001, for domestic assault and brought to the Hancock County Jail. When he arrived at the jail Wood was pat searched pursuant to Hancock County Jail Policies and Procedure number D–220(B)(1). Wood was denied bail until the following morning.

As part of the admissions process Wood was directed to strip naked in front of two corrections officers, shower behind a clear plastic curtain while being watched by the two officers, open his mouth and lift his tongue, lift his arms and expose his armpits, run his fingers through his hair, turn around, bend over, and spread his buttocks. (Wood Aff. ¶¶ 5,6,7; Wood Dep. at 57–67.) For purposes of this motion the defendants do not contest that Wood was intimidated by the corrections officers; one of them indicated that the shower and search could be done "the easy way or the hard way." The room in which the strip and inspection occurred has a window so that Wood was visible to anyone walking by, though there is no indication in this record that any one did see Wood at this time. Wood was told by one of the officers involved in the search that the search was "routine procedure."[2] The jail's record

---

**2.** The defendants want the court to strike Wood's Statement of Material Fact ¶ 22 which states "The search" described in ¶ 21 is "routine procedure" and the supporting ¶ 8 in the Wood Affidavit which states: "Prior to this strip search, upon questioning the correc-

tions officers as to why I had to submit to this search, they indicated that it was 'routine procedure.'" I agree with defendants that the conclusory ¶ 22 in Wood's Statement of Material Fact finds slim support in ¶ 8 of the Wood affidavit, which contains a representa-

for this May 27, 2001, booking indicates only that Wood was subjected to a clothing search by corrections officer Chris Rivers and that he was included in the medium security classification.

On July 20, 2001, Wood was arrested and booked at the Hancock County Jail for violation of a protection order and bail conditions that arose from his May 27, 2001, domestic assault arrest. At this point he was pat searched and denied bail until the following afternoon. He was booked and housed within the general population at the jail.

Once again, after the booking, Wood was required to strip naked, take a shower during which he was not watched, open his mouth and lift his tongue, raise his arms and expose his armpits, run his fingers through his hair, and turnaround.[3] He was not required to bend over and spread his buttocks. The jail record for the July 10 booking indicates that Wood was subjected to a clothing search by corrections officer Chad Wilmot. Wood was classified as minimum security.

On July 11, 2001, Wood was allowed two contact visits with his attorney. He was not given a choice as to whether or not he would visit with this attorney or whether or not the visit would be a contact or non-contact visit. After the second contact visit Wood was required to under go a strip search, which, according to Wood, included being stripped naked in front of a

corrections officer, opening his mouth and lifting his tongue, raising his arms and exposing his armpits, running his fingers through his hair, turning around, bending over and spreading his buttocks.[4]

### B. Policies, Procedures, and Training

Per jail policy, all arrestees unable to be released on bail are required to shower as part of the admissions process, a process which includes disrobing and showering in the presence of a corrections officer. Policy C–120 is entitled "Strip Search/Documentation/Showers." It provides:

1. In order to ensure the health, safety and security of the inmates and staff, each inmate being assigned to a housing unit will be required to shower as part of the admissions process. Inmates will disrobe and shower while in the presence of the Corrections Officer (same sex) in the shower room located in the medical room.

2. The Corrections Officer will conduct a search of the inmate[']s clothing and personal effects for contraband and vermin as the inmate prepares to shower . . . .

3. Each inmate may be subject to a strip search as part of the admission process according to Policy D–220: *Search Procedures*. Searches completed as part of the admissions process will be documented in the inmates booking

---

tion that is quite different from the version of the searching officers' conduct that was given during his deposition. Whether his affidavit is so inconsistent with his deposition testimony as to be stricken is debatable. However, since in the final analysis, I do not believe that whether or not an unidentified officer said that the search was "routine procedure" is dispositive of this motion, I have not stricken the affirmation.

**3.** The defendants assert that this search is immaterial because Wood is challenging the

search on July 11 not July 10. However, Wood did include this search in his complaint (Compl.¶14) and it is relevant to whether there was an unwritten policy and procedure to conduct strip searches on misdemeanor detainees.

**4.** The defendants explain that by policy there should have been a strip search following the first visit with the attorney also and that Hannan "spoke with jail staff" after learning that there was no such search.

noting the type and by whom the search was done.

(Hannan Dep. Ex. 4.)

The strip search policy for the Hancock County Jail vis-à-vis pre-trial detainees/arrestees charged with misdemeanors is set forth in "Policy D–220":

> Jail Staff will conduct searches in the least degrading manner possible. At no time are searches to be used to intimidate, degrade, harass or punish any person.
>
> .     .     .     .     .
>
> At the time of arrest or initial admission to the facility, a pre-trial inmate charged with a misdemeanor offense shall not be subjected to a strip search, unless the officer has a reasonable suspicion to believe that an inmate is concealing contraband and is about to come into contact with inmates of the facility. If an inmate charged with a misdemeanor crime is subjected to a strip search upon initial admission, documentation will be made ...
>
> .     .     .     .     .
>
> Strip searches shall be conducted in private only by and in the presence of [ ] the minimum number of officers of the same sex as the inmate [ ] which are necessary to accomplish the search and to maintain security and protection.

(Clark Aff. Ex. A.)

Policy Number D–220 describes a strip search as: "A visual search of an inmate which requires the removal of all clothing, to include a search of the clothes removed." (Hannan Dep. Ex. at 1.) The policy provides:

> Once the inmate has removed all their clothing and handed it to the officer, the officer shall conduct a visual search of the inmate to include having the inmate shake out their hair, check inside the mouth, ears, nose, their arm pits, bottoms of their feet, under the scrotum (where applicable), lift breast (where applicable) and finally have the inmate bend over, spread their butt cheeks and cough. In addition, the inmate's clothing and footwear shall be searched.

(*Id.* at 2.) Thus, a strip search includes a visual body cavity search.

Wood contends that his post-arrest shower *cum* searches were pursuant to policy (PSMF ¶ 19) but the defendants contend that this search, if it did occur, was not undertaken pursuant to a jail policy or procedure (Defs' Resp. SMF ¶ 19; Hannan Aff. ¶ 2; Clark Aff. ¶ 2).

All jail staff members are trained at the beginning of their employment in the policy for searches of misdemeanant pre-trial detainees and arrestees. The defendants state that periodic updates of this training are provided during the course of employment. (Hannan Aff. ¶ 3; Clark Aff. ¶ 3.) The parties agree that after one forty-hour week of instruction the corrections officers are expected to be familiar with the circumstances under which strip searches could be performed on inmates at the jail. No instructions or directives are given to jail staff regarding strip searches of misdemeanor pre-trial detainees and arrestees that are in any way inconsistent with the contents of Policy D–220.

Hannan and Clark are the final decision and policymaking authorities for all day-to-day operations at the Hancock County Jail. Hannan wrote the Hancock County Policies and Procedures which were approved by Clark, as sheriff.[5] Hannan was

---

5. Based on Hannan's deposition testimony, Wood complains that Hannan is unable to answer questions concerning what the poli- cies applicable to strip searches state without consulting the written policies. (Hannan Dep. at 48–49.) Without providing record

present at the jail from 6:00 a.m. to 6:00 or 7:00 p.m. Monday through Friday and occasional weekends. She covered several different positions. Neither Hannan nor Clark was involved in the alleged May 27, 2001, strip search as participants or directors or supervisors. Hannan and Clark assert that they were unaware of any deviation from the established policy with the sole exception of Wood's allegation with respect to the alleged May 27, 2001, strip search. (Hannan Aff. ¶ 5; Clark Aff. ¶ 5.) They had no passive knowledge of the May 27, 2001, search at the time of the search. They first became aware of the search in the late summer/early fall of 2001, as a consequence of communications with Wood's counsel.[6]

A "contact visit" is a visit during which "any"[7] physical contact between the inmate and the visitor is permitted.[8] The Hancock County Jail has a policy that requires strip searches following contact visits and this policy is specifically set forth in the Hancock County Jail Policy and Procedure Manual in the form of Policy No. F–150. All civilians, including attorneys, are subject to electronic search and must leave their property in a locker prior to entering the Hancock County Jail. The room in which the inmates are allowed contact visits has windows on two sides so that visits can be monitored by jail staff. According to policy, jail staff members are required to monitor visits, including visits with attorneys, in a manner that reasonably insures the privacy of both the inmate and the visitor without compromising the safety and security of the facility. However, the jail does not visually monitor visits between an inmate and his or her attorney and, because of staff shortages, cannot visually monitor every contact visit.

The reason that a strip and visual body cavity search follows contact visits is to protect and maintain institutional security at the jail and to provide a safe environment for inmates and jail staff.[9] One concern behind the policy is to prevent the admission of contraband into the jail. Hannan considers any item not provided to an inmate through the jail to be contraband, regardless of the list of allowed items in the inmate handbook. As jail administrator Hannan has had no personal experience with contraband being brought into the jail and transferred to inmates by

citation, the defendants retort that Hannan did not want to answer the question under oath without first looking up the policy. This peevish dispute is not determinative of this motion.

6. One target of the defendants' motion to strike is Wood's attempt to qualify this assertion by stating that his attorney first learned of the May 27, 2001, related allegations via a July 20, 2001, Freedom of Access request. (PSMF Ex. A.) I fail to see the materiality of this qualification unless Wood is trying to argue that Hannan and/or Clark should have learned of the May 27, 2001 search at some earlier time based upon jail records provided by way of the Freedom of Access request. But the record does not reveal that the May 27 booking report contains any evidence of a strip search, so I remain unconvinced that this qualification serves any purpose.

7. The defendants picked this term "any." I am sure there are some limitations on what type of contact is permitted.

8. Wood asserts that a "contact visit" is a visit where there is no plexi-glass between the parties. However, I could not find adequate support for this qualification in the cited Hannan deposition exhibits. (Hannan Dep. Exs. 6 & 8.)

9. Again, in his reply statement of facts Wood simply denies this statement without referring to any record citation. In his response to the motion to strike he states this denial is further amplified by his Statement of Material Fact ¶ 42. That being the case I address the latter, this denial being redundant.

individuals other than family members and friends. Hannan describes only two occasions in the State of Maine in which there was an attempt to introduce contraband into a county jail in a body cavity.

There are no jail records for May 27 through 28 nor July 10 through 11 that indicate that Wood was searched. There is no evidence that any jail employee harbored an individual reasonable suspicion that Wood was concealing contraband at the time of his May and July detentions.

Each inmate receives the inmate handbook when booked.[10] Wood acknowledged receiving, reading, and understanding all the rules and regulations in the inmate handbook at the time of his May 27, 2001, and his July 10, 2001, admissions. (DSMF Exs. C & D.) Wood states that he signed the form which included the acknowledgment that he read the inmate handbook with a corrections officer and was required to do so as part of the booking process. However, he did not receive or review the handbook, with or without a corrections officer, until after he signed the form. (Wood Aff. ¶ 16.) It is standard procedure that an arrestee does not have an opportunity to look at the inmate handbook until after they have been placed in their housing cell and no one from the jail goes over the handbook with the arrestee. (Hannan Dep. p. 14, lines 23–25; p. 15, lines 1–14.)

### The Constitutionality of the Strip Searches

■ With respect to the July search triggered by the contact visit Wood is attacking the official policy promulgated by Hannan and approved by Clark. "Local governing bodies ... can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Soc. Servs. N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (footnote omitted). With regards to the alleged searches in May and July that occurred after Wood's arrest, Wood precedes on a theory that these searches were made pursuant to a "custom" that was not formalized as a policy. *Id.* at 690–91, 98 S.Ct. 2018 ("[A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."). Because Wood is suing Hannan and Clark in their official capacities the suit against them is identical to the suit against Hancock County. *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *see also Wilson v. Brown*, 889 F.2d 1195, 1197 (1st Cir.1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," citing *Brandon* ).

■ Wood must meet two requirements to maintain a § 1983[11] claim of an unconstitutional municipal custom or practice:

---

10. In his reply statement of facts Wood simply denies this statement without referring to any record citation and in response to the motion to strike he provides no reason why his denial should be countenanced.

11. Section 1983 of title 42 provides are relevant:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the Dis-

First, the custom or practice must be attributable to the municipality, i.e., it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir.1989). Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights. *Id.* at 1157. *Miller v. Kennebec County*, 219 F.3d 8, 12 (1st Cir.2000). This dispute does not generate a concern about the second part of this inquiry, in that if there is a custom or practice that calls for impermissible strip searches, then the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights. *See id.* at 13.

### A. The Post-contact-visit Searches

■ Unquestionably the United States Supreme Court's decision *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) is the jumping off point for the Fourth Amendment analysis of the post-contact-visit search policy. Rejecting the lower court's insistence on a showing of probable cause, the majority concluded in *Wolfish* that a policy common to all Bureau of Prison facilities requiring strip searches with visual body cavity inspections after every contact visit did not run afoul of the Fourth Amendment prohibition on unreasonable searches. 441 U.S. at 558–60, 99 S.Ct. 1861. The defendants assert that the Hancock County Jail's poli-

cy of strip searching inmates after a contact visit is *per se* constitutional under *Wolfish*.

■ The First Circuit has addressed strip search policies in a series of cases post-*Wolfish* and in doing so has made it clear that it reads *Wolfish* to require an application of a balancing test on a case-by-case basis. *See, e.g., Roberts v. Rhode Island*, 239 F.3d 107, 109–13 (1st Cir.2001); *Miller*, 219 F.3d at 12–13;[12] *Swain v. Spinney*, 117 F.3d 1, 5–9 (1st Cir.1997); *Arruda v. Fair*, 710 F.2d 886, 886–88 (1st Cir.1983); *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) ("We have observed previously that the balancing test prescribed in *Wolfish* does not validate strip searches in detention settings *per se*. Although the majority in *Wolfish* did uphold the strip searches conducted there on less than probable cause, the detainees were awaiting trial on serious federal charges after having failed to make bond and were being searched after contact visits," citations omitted.).

In *Wolfish* the Court explained the balancing test as follows:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is con-

---

trict of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

12. *Miller* does not directly mention *Wolfish* but analyzes strip searches to determine if they were "justified by a reasonable suspicion" under *Swain v. Spinney*, 117 F.3d 1 (1st Cir.1997), a case applying *Wolfish*.

ducted, the justification for initiating it, and the place in which it is conducted. 441 U.S. at 559, 99 S.Ct. 1861.

Blinded by their assumption that the jail's post-contact visit strip search policy is *per se* constitutional under *Wolfish*, the defendants have not set forth sufficient facts pursuant to which I can recommend granting judgment in their favor. They state that the policy is aimed at protecting and maintaining institutional security at the jail and providing a safe environment for inmates and jail staff. They also state that one concern behind the policy is to prevent the admission of contraband into the jail.

However, there is no evidence before me about the inmate population at the Hancock County Jail, *see, e.g., Arruda,* 710 F.2d at 887 (emphasizing the relative security needs of the institution, noting that the institution before it was a maximum security facility); the facility's experience with contraband being passed during contact visits in general, *compare Roberts,* 239 F.3d at 112 & n. 6 (finding evidence of a history of contraband problems but a lack of a record of instances where a body cavity search was necessary to discover the contraband) *with Arruda,* 710 F.2d at 888 (noting that the record demonstrated a lengthy history of contraband problems in the institution), let alone contact visits with attorneys; how the facility is structured in terms of the intermingling of inmates and the ease of passing contraband after a contact visit and whether Wood, in particular, was housed in a volatile area with access to other inmates, *compare Roberts,* 239 F.3d at 111 (emphasizing that the plaintiff, while housed in a maximum security facility, was not himself particularly dangerous in holding that the policy requiring a strip/body cavity search of all inmates upon admission did not pass constitutional muster) *with Arruda,* 710 F.2d

at 887–88 (upholding constitutionality of post-contact-visit strip policy as applied to a plaintiff in a special security area—"a prison within a prison"—designed to hold the most dangerous inmates); what types of contraband might be smuggled and hidden in the various areas of the bodies that are searched, *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861 (noting that inmate attempts to secrete money, drugs, weapons, and other contraband were documented in the record before it). There is evidence that Hannan knows of only two incidents in the entire State involving the smuggling of contraband in body cavities. Also, the jail performs a security check of the incoming visitors and the contact visits at the jail can be monitored if staff were committed to that practice; these alternatives to the strip search practice may well come into play in making the reasonableness determination. *See Wolfish,* 441 U.S. at 559 n. 40, 99 S.Ct. 1861 ("assuming" without deciding "that the existence of less intrusive alternatives is relevant to the determination of the reasonableness of the particular search method at issue"); *Roberts,* 239 F.3d at 112 (noting that there were less invasive, less constitutionally problematic ways to conduct searches than via strip/body cavity procedure). Additionally, it is uncontroverted on this record that Wood was not given the choice of having a noncontact-visit with his attorney.

I conclude that the defendants have not generated a summary judgment record sufficient to undertake the analysis of the post-contact-visit strip search policy under *Wolfish* and the First Circuit's post-*Wolfish* precedents on point. I am cognizant that the First Circuit has commended a thoroughgoing factual inquiry in making a reasonableness determination vis-à-vis post-contact visit strip searches. *See Arruda,* 710 F.2d at 886, 888. Therefore I conclude that the defendants are not enti-

240

tled to judgment at this juncture and recommend that the Court **DENY** them summary judgment on this ground.

### B. The Searches Incident to the Arrests

■ Much of the discussion above is applicable to the question of the constitutionality of strip and body cavity searches following an arrest. In brief, it is clear that a strip and visual body cavity search of an arrestee comports with the Fourth Amendment only if it is "justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." *Swain,* 117 F.3d at 5, 7. These searches cannot be used as a device to humiliate, degrade, or retaliate against an arrestee. *Id.* at 8–9.

■ The defendants do not challenge this proposition or suggest that there was reasonable suspicion vis-à-vis Wood at the time of his two admissions to the jail. With respect to Wood's alleged searches in the aftermath of his two bookings, the defendants argue that they were rogue events, to which they were not a party and which were not attributable to any policy or custom.

Not having named the individual officers involved in these searches as defendants Wood skates on thin ice with respect to carrying his summary judgment burden. *Wilson v. Town of Mendon,* 294 F.3d 1, 14 (1st Cir.2002) (concluding that "in principle" the failure to name the constitutional tortfeasor was not fatal to a § 1983 case against a municipality but warning that once the plaintiff chooses this strategy the plaintiff must live with the evidentiary consequences). For, Wood must demonstrate

that there is a genuine dispute of facts material to his claim that there is a "custom" at the jail to strip search misdemeanant arrestees without a reasonable suspicion that the arrestee harbored contraband and that he was searched and his constitutional rights were violated by the non-defendant officers who conducted the search. And, to reiterate, this must be a custom "so well settled and widespread that the policymaking officials of the municipality," here Hannan and Clark, "can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro,* 871 F.2d at 1156.

Wood's evidence on this score is that three different corrections officers on two different occasions subjected him to a strip search and on one of these occasions subjected him to a visual body cavity search. Vis-à-vis the May search Wood claims one of the officers indicated that these searches were "routine practice"[13] and Wood was told by one of the officers that the shower and search could be done "the easy way or the hard way." Wood also points to the policies of the jail arguing that policy C120 required non-bailed arrestees to undergo a shower as part of the admission process and that the definition of the shower process is not much different from that of the strip search. He reports that on both occasions that he underwent the shower procedure he was subjected to a visual inspection of his body and the only difference between these procedures and a visual body cavity search is that during the latter the detainee must bend over and spread his or her buttocks.

---

**13.** Again, this statement has been challenged by defendants as inconsistent with Wood's deposition testimony. Even if the statement were stricken, the facts and circumstances attendant to the *two separate searches,* when viewed in the light most favorable to Wood,

could give rise to the inference that Hannan and Clark knew or should have known of the "custom" of subjecting all arrestees to strip searches without regard for reasonable suspicion standards.

There is also evidence that Hannan was aware that the policies that she promulgated with respect to booking and searches were not being followed to the letter. She admits that arrestees are routinely told to sign the acknowledgement of, among other things, having read the handbook with a corrections officer before they received or read the handbook. She also admits that the fact that Wood was not searched after his first contact visit with his attorney was in contravention to the policy, as was the fact that they were not monitored. Furthermore, during one of Wood's post-admission procedures he was not monitored by the corrections officers, in contravention to the showering policy. Also implicit in this record is a noncompliance with the recording requirements for strip searches, as the defendants admit that the post-arrest searches were something more than a clothing inspection but were recorded as limited to that procedure.

The First Circuit has at least twice indicated that a plaintiff's own experience of being strip searched is probative that there is an existent practice. *Miller*, 219 F.3d at 12 (emphasizing that the plaintiff's own experience being strip searched is undisputed by defendant/county on summary judgment, citing *Bordanaro*, 871 F.2d at 1156); *Bordanaro*, 871 F.2d at 1156 ("Additional support for the existence of such a practice can be inferred from the event itself."); *but see Swain*, 117 F.3d at 11 (addressing a failure to train claim brought by strip searched arrestees, observing that "absent prior claim, it cannot be reasonably inferred," that the defendant police chief, "knew, or should have known, that his officers were not executing that policy"). And though it is undisputed that no instructions or directives are given to jail staff regarding strip searches of misdemeanor pre-trial detainees and arrestees that are in any way inconsistent with the contents of Policy D–220, there is

sufficient evidence to infer that there may be a practice of strip searching these arrestees in conjunction with the admission shower that is done outside the letter of the policies. A jury could infer that the practice at the jail is to conflate the strip search procedure with the shower procedure and that this is such a wide-spread practice that Hannan and Clark knew or should have known that it was occurring. Therefore, I recommend that the Court **DENY** the defendant's motion as to the post-arrest strip search allegations.

### Conclusion

As discussed above, I DENY the defendants' motion to strike. With respect to the defendants' motion for summary judgment I recommend that the Court **DENY** their motion for judgment on the pleadings and **DENY** their motion for summary judgment

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 7, 2003.