**Jane DOE, a Minor, by John DOE, Her Father and Next Friend, and on behalf of others similarly situated, Plaintiffs,**

**v.**

**Ronald PRESTON, Secretary of the Massachusetts Executive Office of Health and Human Services in his personal capacity; Michael Bolden, Commissioner of the Massachusetts Department of Youth Services in his personal capacity; and certain unknown, unnamed employees of the Massachusetts Department of Youth Services, Defendants.**

Civil Action No. 03–11804–GAO.

United States District Court,
D. Massachusetts.

Jan. 30, 2007.

Karl Vrana, Berube & Vrana, P.C., Thomas A. Hensley, Law Office Thomas Arthur Hensley, Taunton, MA, Patrick T. Jones, Timothy C. Kelleher, III, Cooley, Manion, Moore & Jones, PC, Boston, MA, for Plaintiffs.

Mark P. Sutliff, Sarah M. Joss, Attorney General's Office, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff, Jane Doe, by her father and next friend, brings this action to recover damages under 42 U.S.C. § 1983 for what she claims were multiple violations of her right to be free from unreasonable searches while in the custody of the Massachusetts Department of Youth Services ("DYS"). Specifically, she contends that she was wrongly subjected to strip searches of her person pursuant to a policy authorizing such searches that was promulgated and implemented by the named defendants, Ronald Preston, who was at the relevant times (but is no longer) the Secretary of the Massachusetts Executive Office of Health and Human Services, and Michael Bolden, who was at the relevant times (but is no longer) the Commissioner of the Massachusetts DYS. It is her contention that the policy violates the prohibition of the Fourth Amendment to the United States Constitution against unrea-

sonable searches and that the searches of her conducted pursuant to that policy likewise violated her personal right to be free of unreasonable searches. That policy authorizes strip searches of juveniles within DYS custody without reasonable suspicion to believe that any such search will lead to the discovery of contraband.

The complaint contains three counts. Counts I and II present identical claims for damages under § 1983 against Preston and Bolden respectively. The complaint states expressly that the defendants are sued in their individual capacities only. (Compl.¶¶ 7, 8.) Count III alleges that unknown, unnamed employees of DYS administered the strip search policy and subjected her, and others in the putative class of similarly situated juveniles in DYS custody, to unconstitutional strip searches. Unlike Preston and Bolden, the unnamed persons in Count III are said to be sued in both "their professional and individual capacities." (Compl.¶ 9.) None of the unnamed defendants to whom Count III is directed has been identified or served with process, and none has appeared in the action. Consequently, references herein to "the defendants" are references to Preston and Bolden only.

At a scheduling conference held early in the case, it was determined that the inevitable issue of whether the defendants are entitled to qualified immunity from suit and liability under § 1983 would be considered first, before any other question, including possible certification of a plaintiff class. Accordingly, the parties undertook an initial phase of discovery directed principally to the qualified immunity question. The defendants have since moved for summary judgment in their favor on that ground. The plaintiff then cross-moved for summary judgment in her favor. After extended briefing, their motions were argued in May 2006.

After the motions were argued, the plaintiff moved to amend the complaint to add a new plaintiff and new defendants and to seek injunctive relief in addition to monetary damages. The proposed amendments do not eliminate the question of the immunity of the defendants Preston and Bolden from personal liability for damages. For that reason, it is necessary and appropriate to address that question as planned. The motion to amend will be considered in this memorandum following the resolution of the qualified immunity question.

*The Factual Basis for the Claims*

The following facts are either undisputed or are stated favorably to the plaintiff's position. *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir.2005).

By its statutory mandate, DYS is required to provide a comprehensive and coordinated program for preventing juvenile delinquency, making services available "to delinquent children and youth referred to the department by the courts." Mass. Gen. Laws ch. 18A, § 2 (2006). In addition, DYS is to provide "services and facilities for the study, diagnosis, care, treatment, including physical and mental health and social services, education, training and rehabilitation of all children and youth referred or committed" to it. *Id.* In carrying out this mandate, DYS operates a number of residential facilities that maintain various levels of security. Juveniles residing in secure facilities have generally either been detained pending an adjudication of their cases or have been committed to the custody of DYS as a consequence of an adjudication of their case or other basis for commitment.

Beginning November 26, 2001, the defendants oversaw the implementation of a policy applicable to all secure DYS facilities governing searches to be conducted in

those facilities.[1] A copy of the policy, identified as Policy # 3.2.3(c), is appended to this memorandum for reference. The stated purpose of the policy is "to establish procedures regarding proper search techniques resulting in the prevention of contraband into a Location [*sic* ], and if found the practice for the proper handling, storage, and disposal." Massachusetts Dep't of Youth Serv., *Policy # 3.2.3(c)* 1 (2001) [hereinafter Policy]. There are four different categories of searches authorized and described in the policy: location search (search of a place within a facility, such as a juvenile's room), client search (search of the person of a juvenile in DYS custody), visitor search (search of visitors to a facility), and vehicle search (search of vehicles used to transport DYS clients). Client searches, relevant here, are further divided into four categories: a metal detector search, a frisk search, a strip search, and a body cavity search. Of these, it is the strip search that is the focus of the plaintiff's claims.

The policy authorizes strip searches to be conducted without probable cause and as a matter of routine practice only with respect to a juvenile who has been "arraigned; committed to the care of DYS and; placed in a secure facility." Policy,

supra, at 4. According to the policy, a strip search may be performed only by personnel of the same sex as the juvenile and only in private, except for the presence of a witness. *Id.* at 5. The method prescribed for conducting the search is for a staff person to ask the juvenile to remove his or her clothing, which the staff member will also inspect. The staff member is authorized to conduct a "visual inspection" of the juvenile; touching any part of the juvenile's body during the search is prohibited. The search is to include visual inspection of the following specific body areas: mouth, hair, neck, shoulders, outside/inside of arms, armpits, hands/wrists, torso, waistline, buttocks, outside/inside of legs, lower abdomen/crotch, ankles, and feet. *Id.*[2] Although the policy itself does not prescribe when strip searches may be conducted, it was the practice of DYS at all relevant times to conduct strip searches of juveniles routinely "at the time of intake into the facility, after contact visits with persons from outside the facility, and after returning to the facility following a trip outside the facility where the custody of the youth was not constantly maintained by DYS or its vendors or when the youth transitioned to or from settings which may afford the youth the opportunity to gain

**1.** The defendants' liability is predicated on their promulgation and implementation of the policy. There is no allegation that either Preston or Bolden performed any strip searches under the policy, only that they were responsible for the policy pursuant to which strip searches were conducted without reasonable suspicion. Nor is there any claim that the defendants should be held liable for searches conducted by DYS personnel that unlawfully deviated from the policy.

**2.** As noted, the search policy separately authorizes body cavity searches, but only by medical personnel in a medical facility and only upon a showing of probable cause and under the authority of a specific warrant. Policy, *supra,* at 5. Although the plaintiff al-

leges, rather vaguely, that she was subjected to unauthorized body cavity searches, that claim is not part of her case against the present defendants. There is no allegation either that they participated in any unlawful body cavity search or that the policy they are responsible for permitted such searches on terms violative of the Fourth Amendment. It appears that what the plaintiff is referring to is the visual observation by DYS staff of particular body areas, such as the genital and anal areas, rather than any internal examination of them. *Cf. Roberts v. Rhode Island,* 239 F.3d 107, 108 & n. 1 (1st Cir.2001) (defining a "visual body cavity search" as "a strip search that includes the visual examination of the anal and genital areas").

access to contraband." (Edward J. Dolan Aff. ¶ 12, Sept. 27, 2005.) Neither the policy on its face nor DYS practice in implementing it limited strip searches to occasions when the staff had reasonable suspicion to believe the juvenile to be searched was concealing contraband.

The plaintiff was committed to DYS custody on or about November 1, 2002, pending her arraignment on charges that she had committed an assault and battery by means of a dangerous weapon. She was held in a secure facility maintained at the Old Colony Girls Secure Detention Unit in Brockton, Massachusetts, managed for DYS by Old Colony YMCA Services Corporation, until March 20, 2003, when she was released on recognizance.[3]

During her detention, she was subjected to strip searches after every parental visit, after every court appearance, after a visit with her defense counsel, and after every dental visit outside the facility. (*See* Timothy C. Kelleher Aff. Ex. 1 at ¶¶ 7–9.) These searches were conducted pursuant to the policy and regular practice of DYS as authorized by the defendants, without any prior determination that there existed reasonable suspicion that the plaintiff was harboring contraband on her person.

*Relevant Substantive Law*

a. *Reasonableness, vel non, of strip searches*

■ In *Bell v. Wolfish,* the Supreme Court addressed a claim by adult inmates in a federal detention facility that strip searches that included visual, but not tactile, inspection of bodily cavities violated the Fourth Amendment's prohibition against unreasonable searches. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Court set forth the substantive standard for evaluating such claims, including those presented in this case:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. 1861. The First Circuit has applied this test to uphold strip searches of inmates housed within a security unit in a state correctional institution, *Arruda v. Fair,* 710 F.2d 886 (1 st Cir. 1983). The same test was used to find unreasonable under the Fourth Amendment searches that were conducted without reasonable suspicion that contraband was being concealed by visitors to a prison, *Blackburn v. Snow,* 771 F.2d 556 (1 st Cir.1985), or by persons arrested for minor, non-violent offenses who were being detained pending arraignment either at a police station, *Miller v. Kennebec County,* 219 F.3d 8 (1st Cir.2000) and *Swain v. Spinney,* 117 F.3d 1 (1st Cir.1997), or at a detention facility, *Roberts v. Rhode Island,* 239 F.3d 107 (1st Cir.2001). In each case, the court of appeals gave consideration to the various competing interests as they appeared in the particular circumstances of the case at hand, just as the *Bell v. Wolfish* test requires. Accordingly, in this case a focused application of the *Bell v. Wolfish* balancing test also is required to determine whether, in the circumstances outlined in the plaintiff's allegations and supporting evidence, strip searches conducted pursuant to the DYS policy violated her right to be free from unreasonable

---

**3.** She was ultimately acquitted by a jury of the charges against her in August 2003.

searches.[4]

### b. *Qualified immunity*

■ The Supreme Court has outlined a two-step approach for analyzing qualified immunity claims. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, the court must consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If so, the second question is whether that right was clearly established at the relevant time. *Id.* Only after articulating the particular constitutional right at issue can the court determine whether the right was clearly established at the time of the purported constitutional deprivation. *Id.*

■ The identified constitutional right must be articulated with relative specificity. *See Riverdale Mills Corp. v. Pimpare,* 392 F.3d 55, 62 (1st Cir.2004) ("[I]t is clear that when performing the first prong of the analysis, it is generally inadequate to state a very generalized proposition such as whether it is a constitutional violation for enforcement officers to perform an unreasonable search."); *see also Int'l Action Ctr. v. United States,* 365 F.3d 20, 25 (D.C.Cir.2004) ("It does no good to allege that police officers violated the right to

free speech, and then conclude that the right to free speech has been 'clearly established' in this country since 1791.").

In this circuit, the second *Saucier* step is sometimes considered in two parts, asking first whether the asserted right was clearly established at the time of the alleged violation and, if so, then asking whether an objectively reasonable official would have been on notice that his conduct would violate that right. *Riverdale Mills,* 392 F.3d at 60–61; *see also Suboh v. Dist. Attorney's Office,* 298 F.3d 81, 90 (1st Cir. 2002).

### *The Present Case*

The constitutional question in this case is whether the strip search policy adopted and implemented by the defendants caused Jane Doe to be subjected to strip searches in violation of the Fourth Amendment's prohibition against unreasonable searches. As described above, whether any search (or search policy) is unreasonable under the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct.

---

**4.** In some situations, the Supreme Court has noted that a "search unsupported by probable cause may be reasonable when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Board of Education v. Earls,* 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). As other courts have realized when addressing a routine search of juveniles in a detention facility, the special needs test does not supplant the basic reasonableness test of the Fourth Amendment. Rather, to determine if there is a special need, requires a " 'fact-specific balancing of the intrusion ... against the promotion of legitimate governmental inter-

ests.' " *Smook v. Minnehaha County,* 457 F.3d 806, 810 (8th Cir.2006) (quoting *Board of Education v. Earls,* 536 U.S. at 829, 122 S.Ct. 2559); *N.G. v. Connecticut,* 382 F.3d 225, 231 (2d Cir.2004) (same). In this respect, the special needs test is subsumed within the general *Bell v. Wolfish* test. *N.G.,* 382 F.3d at 231 (stating that the special needs test is "simply an application of the overarching principle" contained within *Bell v. Wolfish* ); *Reynolds v. City of Anchorage,* 379 F.3d 358, 364 (6th Cir.2004) (stating that the reasonableness under the Fourth Amendment of a strip search policy of a juvenile is to be made in accordance with the *Bell v. Wolfish* standard).

1861. As the *Bell v. Wolfish* test makes abundantly apparent, definition of the Fourth Amendment right is intensely factual and contextual in nature. The assessment of the competing interests involved and the particular weight then given to each in the balancing exercise will determine whether there was a violation of the Fourth Amendment. In other words, depending on the relative weights assigned to the various factors determined to be pertinent, there may or may not have been a Fourth Amendment violation in this, or any, case.

At this stage of the case, before full development of a factual record, including the resolution of material factual disputes, it is not possible to conduct adequately the required balancing analysis. In particular, it is not possible even to describe fully each of the *Bell v. Wolfish* factors as they exist in the present controversy. For example, the parties disagree about the scope and manner of the searches conducted of the plaintiff. They further differ as to the possible justifications for the search policy. With the factors and their relative importance undefined, the required balancing cannot be done. In sum, resolution of the constitutional question presented will depend on specific fact-finding and evaluation that cannot be accomplished on motions for summary judgment.

In this circumstance, a dilemma arises. On the one hand, *Saucier* counsels that a court faced with a claim of qualified immunity must first consider whether the facts alleged show that the relevant defendant's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If following this direction requires a full evaluation of contested factual issues, which is not possible at the summary judgment stage based only on affidavits submitted by the adverse parties, then summary judgment on qualified immunity

grounds would have to be denied to the defendants.

On the other hand, it is clear that the privilege of qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 200–01, 121 S.Ct. 2151 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (emphasis in original). In *Saucier* itself, the Supreme Court instructed that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Id.* at 200, 121 S.Ct. 2151 (quoting *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806). The Court added, "As a result, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* at 201, 121 S.Ct. 2151 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

In *Saucier* the factual allegations supporting the plaintiff's claim were relatively straightforward, and consequently the prescribed sequence for consideration of the issues involved in the qualified immunity defense could readily be followed. The First Circuit has observed, however, that the question whether there was a constitutional violation "may depend on a kaleidoscope of facts not yet fully developed," and therefore that "[i]t may be that *Saucier* was not strictly intended to cover [such a] case." *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 70 (1st Cir.2002).

The Supreme Court's reason for "insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry" is that doing so will aid the "law's

elaboration from case to case," in the course of which principles may be articulated "which will become the basis for a holding that a right is clearly established" for similar controversies arising in the future. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. As the First Circuit has noted, however, that purpose is less likely to be achieved satisfactorily "where the Fourth Amendment inquiry is a reasonableness question which is highly idiosyncratic and heavily dependent on the facts." *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006). That is especially true where the factual determinations that need to be made involve not simply deciding what happened as a matter of historical fact— e.g., what did the police do when they arrived at the plaintiff's house, as in *Buchanan*, 469 F.3d at 167–68—but also involve identifying, valuing and balancing competing interests, as required by the *Bell v. Wolfish* test.

The fine tuning of competing interests can be done most confidently after a full evidentiary hearing on the merits. Facts can be found, values can be assigned, and a balance struck, all in reference to specific and detailed findings based on the evidentiary record. At the summary judgment stage, however, disputes are likely, perhaps as to base facts, but certainly as to the relative value and balance of interests in the concrete case. In such circumstances, there are only two practical options: either judgment can be deferred until a full hearing or judgment can be made prior to that on a version of the disputed facts most favorable to the plaintiff. *See Dirrane*, 315 F.3d at 70. The former course is undesirable because it prevents the early determination of the question of qualified immunity. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 ("The approach the Court of Appeals adopted—to deny summary judgment any time a material issue of fact remains on the excessive force claim—could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))).

The second option, basing a conclusion about the existence of a constitutional right exclusively on the record in its most favorable light to the plaintiff's claim, may also be undesirable. It runs the considerable risk of basing the elaboration of constitutional principles on hypothetical cases, since it will be only the rare case where the facts found after full adjudication would mirror the plaintiff's best pretrial version. Assuming facts in the light most favorable to the plaintiff is not an assessment of the realistic possibility of the plaintiff's proving those facts, and not uncommonly a plaintiff who has had the benefit of a particular factual assumption in her favor at the summary judgment stage will fail to establish that fact by her proof at trial. Making constitutional pronouncements on facts that are not tested by proof, and are not even required to be shown to be reasonably likely to be true, is not a very sound method for elaborating new constitutional principles.

In this case, we have the circumstance identified by the First Circuit in *Buchanan*: "Given the complexity of the matter, and since it is perfectly clear that the officers are entitled to immunity, we turn to the second and third prongs [of the qualified immunity test]." 469 F.3d at 168. And so, I turn to those prongs: was it clearly established that the strip search policy complained of by the plaintiff was unreasonable under the Fourth Amendment, and would an objectively reasonable state official in the position of the defendants have known that adopting and pro-

mulgating the DYS policy at issue violated that clearly established law?

■ Whether the constitutional principle was clearly established at the time the plaintiff was subjected to the searches, late 2002 and the first quarter of 2003, is to be determined by looking to the law of this circuit and then, if there is no directly relevant circuit law, considering what other jurisdictions have held with respect to the issue. *See Savard v. Rhode Island,* 338 F.3d 23, 28 (1st Cir.2003) ("To attain the necessary perspective, an inquiring court must look back in time and conduct the juridical equivalent of an archaeological dig. The court must canvass controlling authority in its own jurisdiction and, if none exists, attempt to fathom whether there is a consensus of persuasive authority elsewhere.").

No First Circuit case has yet addressed the question of routine, suspicionless strip searches of juveniles committed to state custody. Cases in this circuit addressing the constitutionality of strip search policies have considered searches of adult inmates in maximum security facilities where there is a strong interest in maintaining security and good order against attempts at smuggling in contraband, *see Arruda,* 710 F.2d 886, and searches of persons recently arrested for relatively minor offenses who are held in temporary detention facilities housing persons unlikely to have any incentive or opportunity to smuggle contraband into the facility, *see Roberts,* 239 F.3d 107, and *Swain,* 117 F.3d 1.

So far as our and the parties' research indicates, no circuit had considered strip searches in a juvenile detention facility at the time the defendants promulgated and implemented the policy at issue here. Since then, some appellate courts have addressed the issue of routine strip searches in juvenile detention settings but, notably, those courts have commented on the novelty of the legal issues presented. *See, e.g., Smook v. Minnehaha County,* 457 F.3d 806, 810–11 (8th Cir.2006); *Reynolds v. City of Anchorage,* 379 F.3d 358, 367 (6th Cir.2004); *N.G. v. Connecticut,* 382 F.3d 225, 233 (2d Cir.2004). In *Smook,* for example, the Eighth Circuit found state officials entitled to qualified immunity for allegedly wrongful strip searches at juvenile detention center conducted in 1999 because "[a]s of that year, there was no appellate decision from the Supreme Court, this court, or any other federal circuit ruling on the reasonableness of strip searches of juveniles in lawful state custody." 457 F.3d at 813. The Second Circuit in *N.G.* did not directly address the qualified immunity question but nevertheless noted in framing the substantive constitutional issue that "neither side has called to our attention an appellate ruling on the reasonableness of strip searches of juveniles in lawful state custody, in the absence of individualized suspicion of possession of contraband." 382 F.3d at 233. The Sixth Circuit similarly observed in *Reynolds* that "[t]here has been no decision of the Supreme Court, this court or any courts within this circuit—or, as far as we know, of any other court—that has addressed the application of the Fourth Amendment to strip searches of juvenile delinquents in an institutional home in which they are confined." 379 F.3d at 367.

■ It is certainly true, however, that as a general matter, "officials can still be on notice that their conduct violates established law even in novel factual circumstances" and that a plaintiff need not show "that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful" to overcome a qualified immunity defense. *See Savard,* 338 F.3d

at 28 (internal quotations and citations omitted).

The plaintiff argues that the defendants were on notice that their strip search policy violated clearly established law because "closely analogous cases" clearly established that policies permitting strip searches conducted on a routine basis without individualized reasonable suspicion were unlawful, *see Roberts,* 239 F.3d at 109–10 (finding unconstitutional a state policy of routine strip-searching of adults arrested for minor offenses prior to detention in state custody); *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980) (finding unreasonable school officials' strip search of a 13–year–old female student to find narcotics, in the absence of reasonable cause to believe she possessed narcotics), whereas policies that required reasonable suspicion as a condition to a strip search passed constitutional muster, *see Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992) (finding constitutional searches of incarcerated juveniles conducted upon a showing of reasonable suspicion of possession of contraband); *Ford v. City of Boston,* 154 F.Supp.2d 131, 140 (D.Mass.2001) (requiring reasonable suspicion to search Boston city arrestees).

 Nevertheless, "the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law.... The bottom line is that the qualified immunity defense prevails unless the unlawfulness of the challenged conduct is 'apparent.'" *Savard,* 338 F.3d at 28 (internal quotations and citations omitted). Unlawfulness would be "apparent" where there existed no plausibly significant distinction between one set of facts (the decided case) and another (the new case). *Id.* at 30 (explaining how the factual circumstances of

*Swain* and *Arruda* were reasonably distinguishable from that case). Conversely, if there were distinctions between the facts of the two cases that could plausibly affect the outcome of the *Bell v. Wolfish* balancing test, then the resolution of the balancing in the prior case would not make "apparent" the outcome of the balancing in the latter case. *Id.*

The defendants argue that there are a number of reasons why the case of juveniles committed to the custody of DYS can be substantially distinguished from the cases of adults arrested for minor offenses. Most notably, they point out that DYS differs from the kinds of law enforcement agencies or adult correctional institutions considered in prior cases because "when a juvenile is entrusted to its care, DYS is charged with acting in a *parens partriae* role." (Mem. in Supp. of Defs.' Mot. for Summ. J. 36.) In this respect, they argue, "DYS has a heightened duty to protect juveniles who are entrusted to its care." (*Id.* 45.) "Having a search policy that requires every juvenile to be strip searched at intake ensures that every juvenile in a particular facility knows that each other juvenile has been checked for gang symbols, signs of abuse, weapons, drugs and other contraband that a juvenile could use to harm himself or herself or others." (*Id.* 40.)

In the cases involving strip searches of adults, the justification offered for the policy of suspicionless searches has typically centered around the legitimate, though not all-trumping, interest in assuring institutional security. *See, e.g., Bell v. Wolfish,* 441 U.S. at 560, 99 S.Ct. 1861 ("[W]e deal here with the question whether visual body-cavity inspections ... can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we

conclude that they can.") (emphasis in original); *Roberts,* 239 F.3d at 110–11 ("This Court has recognized that institutional security is a legitimate need of law enforcement, and may provide a compelling reason for a warrantless strip search absent reasonable suspicion of individual wrongdoing."). The defendants' argument is that, unlike police departments and correctional facilities, DYS is engaged not simply in law enforcement but also in child development, and that consequently "institutional security" in the context of a DYS residential facility implicates more than simply maintaining order and includes a fostering environment in which its clients can be not only disciplined but nurtured.[5] Thus, they say that while searches for contraband are necessary to enforce the rules, a law enforcement goal, they also serve the broader developmental goals that DYS, unlike the local police or the state prison, is commissioned to achieve.

This argument is not unique to this case. On the differences between the adult and juvenile contexts, the Second Circuit observed:

> Strip searches of children pose the reasonableness inquiry in a context where both the interests supporting and opposing such searches appear to be greater than with searches of adults confined for minor offenses. Where the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm. "Children ... are assumed to be subject to the control of their parents, and if parental control falters, the State must

play its part as *parens patriae* .... In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's '*parens patriae* interest in preserving and promoting the welfare of the child.'" At the same time, the "adverse psychological effect of a strip search is likely to be more severe upon a child than an adult, especially a child who has been the victim of sexual abuse."

*N.G.,* 382 F.3d at 232 (citation omitted; ellipsis in original); *see also Smook,* 457 F.3d at 812 (taking note of the "state's legitimate responsibility to act *in loco parentis* with respect to juveniles in lawful state custody").

The question at this juncture is not whether any differences between juvenile detention facilities and adult detention facilities are significant enough to result in different outcomes of the *Bell v. Wolfish* balancing test for Fourth Amendment purposes. Rather, the inquiry is whether any such differences are of sufficient significance that the outcome of the balancing in an adult context does not necessarily presage the outcome of the balancing in a juvenile context. If so, then the unreasonableness of routine, suspicionless strip searches in the juvenile context could not be said to be "apparent" from the decisions dealing only with the adult context.

In considering what had or had not been "established" by prior case law, it would be a mistake to look simplistically only to the nutshell "holding" of a case—whether a suspicionless strip search was upheld or condemned—without also examining how the court arrived at the holding. *Roberts,* which the plaintiff relies on because of its holding, is a good example. The *Roberts*

5. *See supra* note 4 for a discussion of "special needs" in the context of the Fourth Amendment analysis.

court found the Department of Corrections policy sanctioning a strip search of inmates without reasonable suspicion to be unconstitutional. 239 F.3d at 113. Attention to the entire opinion, however, shows how careful and fact-specific is the proper application of the *Bell v. Wolfish* balancing test. First, the *Roberts* court considered whether the policy at issue served the same interest in contraband interdiction that had led to the sustaining of suspicionless searches in *Bell v. Wolfish* and *Arruda*, and concluded that because a recently arrested person would not likely have planned to smuggle contraband into a police station, the policy at hand did not serve that interest. *Id.* at 111. Next, the court concluded that a person arrested, as Roberts was, for a minor offense did not pose the same risk to institutional order that the hardened inmates of *Bell v. Wolfish* and *Arruda* did. *Id.* Moreover, the court concluded that where the violation for which Roberts had been arrested was not one generally associated with weapons or contraband, a more specific suspicion that weapons or contraband would be found would be necessary to justify a strip search. *Id.* at 112. Finally, the court concluded from the factual record before it that the detention facility at issue had in the past employed searches that were less intrusive and yet effective for discovering contraband, and therefore strip searches were unnecessary to achieve the legitimate objective. *Id.*

The record submitted with respect to the present motions indicates that at least some of those considerations would be evaluated differently in this case. For one thing, the risk of planned introduction of contraband into a facility would seem significantly higher in the case of an inmate of a residential institution than in the case of a sudden and unexpected detention due to an arrest. *See id.* at 111 (suggesting it is more likely that long-term inmates with contact visits would introduce contraband than would recently arrested detainees). For another, unlike Roberts, Jane Doe was detained pending adjudication of a charge of assault and battery with a dangerous weapon, so her offense was "associated with weapons," *id.* at 112, in a way that Roberts' offense was not. In addition, the record in the instant case includes evidence that the introduction of contraband into DYS facilities is a serious and continuing problem, arguably to a degree greater than the court thought true in the *Roberts* case.[6]

The potential differences between the contexts in the prior cases and the context of juveniles held in residential facilities in the custody and care of DYS are not trivial. *See Smook*, 457 F.3d at 812–13; *N.G.*, 382 F.3d at 233–38. I conclude that the context of an adult arrested for a minor offense, as in *Roberts* and *Swain*, is sufficiently distinct from the context of a juvenile detained pending trial in a secure DYS facility that, at the very least, the *Bell v. Wolfish* balancing would have to be done independently for the juvenile case, with the consequence that its outcome could not be predicted to be necessarily the same as in the prior cases decided on different facts. *See Smook*, 457 F.3d at 813 (stat-

---

**6.** There are at least some limited similarities to the context of *Arruda* case where suspicionless strip searches were upheld. 710 F.2d at 886–88. In reaching that judgment, the court evaluated the institutional administrators' concerns about the risk of contraband being introduced through the comings and goings of prisoners in different units of the same prison and found them sufficient to outweigh the privacy intrusion imposed on the inmates. *Id.* at 888. One can always debate how much of a risk is too much to take and what level of risk may be tolerable. The defendants could reasonably have understood from *Arruda* that they were able to make similar discriminating judgments.

ing, "Our court, like many others, had concluded that a strip search of adult offenders without individualized suspicion was unreasonable, but those cases did not consider the different interests involved when the State has responsibility to act *in loco parentis.*"); *see also Reynolds,* 379 F.3d at 367.[7] Again, the present question is not whether those differences warrant a different balancing in this case than in the prior ones, but rather whether objective persons in the defendants' positions could reasonably have thought so and thus would not have understood that their actions in promulgating and implementing the policy violated a clearly established principle of constitutional law.

In sum, decisions concerning the lawfulness of strip searches of persons in custody have been divergent, with the determining factors often relating to the specific kind of facility and the particular characteristics of the searched individual. In *Savard,* the district court ruled that the Rhode Island officials who were responsible for the strip search policy found unconstitutional in *Roberts* were entitled to qualified immunity from a post-*Roberts* suit by other inmates similarly situated to Roberts who had also been searched. The judgment was affirmed by an equally divided en banc court. *Savard,* 338 F.3d at 25. As Judge Selya wrote for himself and three colleagues, "The law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review...."

[T]he lack of any direct precedent and the undulating contours of the law during the relevant period combine to persuade us that the constitutional violation was not obvious; the defendants reasonably could have thought, prior to [the district court's opinion] that there was room in the law for the [defendants'] strip search policy." *Id.* at 30, 32. Here likewise. Whatever the ultimate judgment about the constitutionality of the DYS strip search policy, an objective person in the defendants' position, aware of the decided cases pertinent to the question, could reasonably have thought that the DYS policy did not violate the Fourth Amendment.

For this reason, the defendants are entitled to qualified immunity from damages under § 1983, and their motion for summary judgment on that basis should be allowed.

*Other Constitutional Claims*

There is one final substantive loose end with respect to the present complaint. It contains in Count III some general references to rights under both the United States Constitution and the Massachusetts Declaration of Rights to "life, liberty and privacy, and a right to be free from cruel and unusual punishments." (Compl.¶ 55.) In their motion, the defendants seek summary judgment as to any claims that the plaintiff may be raising under the Fifth or Eighth Amendments to the United States Constitution or under any provision of state law. The plaintiff objects that only the matter of qualified immunity was to be considered at this stage of proceedings, in accordance with the scheduling order pre-

---

7. The decision in *Commonwealth v. Thomas,* 429 Mass. 403, 708 N.E.2d 669 (1999), that under Massachusetts law police must have probable cause in order to conduct a strip and visual body cavity search of an arrestee does not establish that the defendants should have reasonably understood that the searches pursuant to the DYS policy would be unreasonable as a matter of federal constitutional law. Moreover, the *Thomas* case is plausibly distinguishable from the present one for the same reasons that the *Roberts* and *Swain* cases are plausibly distinguishable.

viously discussed. She is; strictly speaking, correct. But the qualified immunity question having now been resolved, judgment will enter for the individual defendants under Counts I and II. The language referring to rights under constitutional provisions other than the Fourth Amendment appears only in Count III, which is not directed at either Preston or Bolden. No claim has been articulated in either Count I or Count II against the individual defendants that they should be liable for damages under § 1983 for violations of Jane Doe's rights under the Fifth or Eighth Amendments. And, of course, they cannot be liable under § 1983—the only cause of action pled against them—for any violation of Jane Doe's rights under state constitutional or statutory law.

*The Placeholder Count III*

As noted, Count III asserts claims against unknown, unnamed DYS employees. Because the two defendants actually identified in the complaint, Preston and Bolden, are entitled to judgment in their favor as to Counts I and II (the only counts raised against them), there will be no surviving actual claim in the case to which the "placeholder" claim in Count III can be anchored. Without identified parties who are joined in the case as to Count III, and there are none, there is no way to litigate the claims set forth. The plaintiff has no adversary with respect to Count III, and the action would be the sound of one hand clapping. The solution to this problem is to dismiss Count III without prejudice.

*Motion to Amend Complaint*

After the hearing on the summary judgment motions, the plaintiff moved to amend the complaint to add (not substitute) as defendants the successors in office to Preston and Bolden, this time specifically in their official capacities as well as their individual ones, and to add a new plaintiff,

another juvenile who had been subjected to strip searches when he was in DYS custody. The proposed amended complaint also seeks to enjoin state officials in charge of DYS from continuing the strip search policy.

Normally, amendments are to be liberally allowed in the interests of justice, Federal Rules of Civil Procedure 15(a), but they are not automatic. One reason for denying leave to amend is that the proposed new claims are legally futile. *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 191 (1 st Cir.2006) ("Critically, we have held that '[w]here an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters.'" (quoting *Correa–Martinez v. Arrillaga–Beléndez*, 903 F.2d 49, 59 (1st Cir.1990), *overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernandez*, 367 F.3d 61, 66 (1st Cir.2004))). That is the case with respect to the claims in the proposed amended complaint that are made against individual state officials, past or present, in their personal capacities under § 1983, because those officials are entitled to qualified immunity as to such claims, for the reasons set forth above. Although the immunity of the newly named state officials would presumably have to be assessed as of a later time than has been done herein with respect to Preston and Bolden, it remains the case that the basic proposition underlying the plaintiff's claims—that juveniles in a secure custodial facility may not be strip searched unless there is a reasonable suspicion that the search will yield contraband—still has not been clearly established, and objectively reasonable officials in the position of the proposed new defendants would not know that enforcing the DYS strip search policy violates the rights of juveniles such as Jane Doe or the prospective new plaintiff,

James Doe. The recent cases from other circuits referred to above, *Smook*, *N.G.*, and *Reynolds*, all reinforce the necessity of a fact-specific evaluation, under the *Bell v. Wolfish* test, of particular search policies and practices. It is not possible to extrapolate from the holdings of those cases a clearly established right that must be applied to the DYS policy, because, as those holdings themselves illustrate, there is no consensus about what generalizations may or may not properly be made as to the limits of a constitutional search policy.[8] Nor does the amended complaint suggest any, except the bright-line limit that would always require, in any circumstance, reasonable suspicion (or "a reason" or "cause" or "probable cause") prior to a search. But the cases have rejected such a simple, bright-line approach, *Smook*, 457 F.3d at 810; *Reynolds*, 379 F.3d at 362–64; *N.G.*, 382 F.3d at 233, and in view of their unanimity as to that rejection (though they diverge on other points), the constitutional standard proposed by the proffered amended complaint can hardly be thought to be "clearly established."

A claim against the current officials in charge of enforcing the strip search policy in their official capacities would not be barred by qualified immunity, however, and the proposed amended complaint does include such a claim in Counts III and IV (and perhaps Count V). But such a claim would be new to the case. Although the existing complaint contains a prayer for an injunction, the only defendants who have properly been joined as parties to the action are Preston and Bolden, and the complaint is explicit that they are sued only in their individual, not their official, capacities. That being the case, the prayer for injunctive relief at the end of the present complaint is untethered to the claims actually asserted in Counts I and II and may be disregarded as surplusage, at least as to those counts. It is true that, unlike Preston and Bolden, the unnamed, unknown DYS employees referred to in Count III of the existing complaint are said to be sued in both their individual and "professional" capacities, and that would be a basis for a claim of prospective injunctive relief. But as noted above, nothing has been done to turn that placeholder count into an active one; no person has actually been named or served, and no person within that generally described group is now a party to the case.

So we have a complaint with no viability as it stands and the proposal is to amend it by adding a new claim of potential viability. The form of the amended complaint that is proposed contains both non-viable and potentially viable ones. It would have to be redrafted in order to eliminate the non-viable ones. There is no substantial difference between redrafting the proposed amended complaint to set forth the potentially viable claims and drafting and filing a new complaint. Viewed in this way, the question whether to allow an amendment boils down to the relatively minor matter of administrative convenience: which is preferable, a new kernel in an old husk, or a fresh beginning? Since nothing of substance seems to turn on the question, I prefer the latter; it is neater, and the substantive question can be framed straightforwardly in a new complaint.

*Orders*

Accordingly, the following orders are made:

1. The motion of the defendants Preston and Bolden for summary judgment as

---

8. *See N.G.*, 382 F.3d at 233–34 (stating that even within a single case, "the justifications are not the same for each search" and weighing each search separately).

to Counts I and II respectively on the ground of qualified immunity is GRANTED (dkt. no. 18).

2. The plaintiff's cross-motion for summary judgment is DENIED (dkt. no. 29).

3. The motion to strike portions of the defendant's motion for summary judgment for addressing issues beyond the constitutionality of the strip search policy and qualified immunity is DENIED (dkt. no. 30).

4. The placeholder claim in Count III is DISMISSED WITHOUT PREJUDICE, both as to any claim for damages under § 1983 and any claim for declaratory or injunctive relief against state employees in their official capacities.

5. The motion to file an amended complaint is DENIED (dkt. no. 45).

The Clerk is directed to enter a final judgment accordingly.

## APPENDIX

---

### MASSACHUSETTS
### DEPARTMENT OF YOUTH SERVICES

**Section:** <u>Security, Safety, and Emergency</u>

**Policy#:** <u>3.2.3(c)</u>

**Repeals:** <u>policies</u>
<u>3.2.3(b) Searches</u>
<u>3.2.6(a) Control of Contraband</u>
<u>3.2.10(b) Metal Detectors</u>
<u>all dated January 1, 1992</u>

**Subject:** <u>Searches</u>

**Signed Date:** October 25, 2001

**Effective Date:** November 26, 2001

**Origin:** <u>Central Office</u>

**Approved:** *Edward J. Dolan*
_Signature_

**Page** <u>1</u> **of** <u>10</u>

**Authority/References:**
ACA: 3-JTS-3A-19 – 21, 2-CO-3A-01
PBS Sec2
DYS: 3.2.8 Restraints and Use of Force

**Attachments:** Contraband Chain of Custody Form

Commissioner
_____
Title

**Applicability:** All State and Provider Locations

---

The purpose of this policy is to establish procedures regarding search techniques resulting in the prevention of contraband into a Location, and if found the practice for the proper handling, storage, and disposal.

The goal of this policy is to maintain safety and security at all locations through contraband prevention and proper handling.

*Policy*

Location personnel shall ensure the orderly operations, safety and security of clients and staff within a location, by conducting location, client, visitor, and vehicle searches when appropriate.

Prevent the introduction of contraband into the Location and minimize access to contraband within the Location.

Page 2 of 10

Documentation of all searches and results shall assist Location staff in the chain of custody process and ensure the proper handling of seized contraband.

The correct use of hand-held and or walk through metal detectors shall provide Location staff with an alternative method of a non-intrusive search of clients and or visitors.

**Procedures**

A. *General Considerations*

1. Location search procedures may include but are not limited to the following:

 a. Unannounced and irregularly timed searches of rooms, clients, and client work areas;

 b. Inspection of all vehicular traffic and supplies coming into the Location;

 c. Use of metal detectors at entrances into the Location;

 d. Search and inspection of each room prior to occupancy by a new client;

 e. Avoidance of unnecessary force, embarrassment, or indignity to the client during a search;

 f. Staff trained in effective search techniques that protect both client and staff from bodily harm;

 g. Use of non-intensive sensors and other techniques instead of body searches whenever feasible;

 h. Conduct searches only as necessary to control contraband or to recover missing or stolen property and;

 i. Respect juvenile rights when performing searches.

2. Location personnel shall communicate the rationale for all searches to clients, visitors, and personnel.

3. The Location Manager/designee shall ensure that a notice is conspicuously posted that informs visitors of the goal of this policy and that a search may be required prior to entry. The posting shall also indicate the location's search policy is available upon request.

B. *Location Searches*

1. Frequency

 a. Operating procedures shall outline the frequency and rationale for location searches necessary to maintain the safety and security of the unit.

 b. Location personnel shall perform searches for contraband, at a minimum, once a week.

 Page 3 of 10

 c. Location personnel shall search outside recreational areas before and after use.

 d. New equipment and supplies entering location shall be opened and searched, including scanning by metal detectors whenever available.

2. Method

 a. Location personnel may use a reasonable amount of force consistent with Policy 3.2.8 Restraints and Use of Force in situations where a client seeks to obstruct a location search.

b. Whenever possible, the Location Manager shall plan searches for times when a maximum number of personnel are available to minimize the need for client room confinement.

c. The length of time needed for a location search shall be determined by:

● the reason for the search;

● number of personnel available to assist in a search and;

● the safety and security of the location.

d. Location searches shall be unannounced and random.

e. Location personnel may use hand-held metal detectors and other proven contraband discovery methods to assist in a location search.

C. *Client Searches*

1. Metal Detectors

a. Locations that are equipped with metal detectors may use them to screen youths entering the location for the first time or when returning from outside activities.

b. Location personnel shall test all metal detectors for accuracy prior to their first time in use.

c. When possible screenings shall be conducted by personnel of the same sex as the client.

d. All metal detector alarms shall require the remove of all metal objects from the youth into a holding basket.

Page 4 of 10

e. The youth shall pass through the walk-through metal detector or be swept by the hand held metal detec-

tor for a second time to determine the specific area of alarm.

f. Youths may then be frisked searched.

2. Frisk Search

a. All youths regardless of placement shall receive a frisk search.

b. For youths transitioned to the Community a metal detector search followed by a frisk search shall be conducted.

c. Frisk searches may be performed upon first time arrival into a location, movement from one area of a secure facility to another that may contains potential weapons and or contraband, such as dining rooms, vocational areas, and indoor/outdoor recreational areas.

d. Frisk search shall be conducted by personnel of the same sex as the client from top to bottom in the following manner:

● Mouths (the client shall lift his/her tongue, and moving it around);

● hair;

● neck/skirt collar area;

● shoulders;

● outside/inside of arms;

● armpits;

● hands/wrists;

● torso;

● waistline;

● buttocks;

● outside/inside of legs;

● lower abdomen/crotch;

● ankle;

● soles of shoes and;

● under the bra-line, for females.

3. Strip Search

a. A strip search may be conducted without probable cause and as part

of routine procedure *only in situations* where the youth has been:

- arraigned;
- committed to the care of DYS and;
- placed in a secure facility.

Page 5 of 10

b. The strip search shall be performed by personnel that are of the same sex as the youth. Strip searches shall be conducted in private and in the presence of a witness.

c. Staff shall ask the youth to remove his/her clothing, as well as conduct an inspection of the youth's removed clothing. Staff shall not touch any body part of a youth during a strip search. Staff shall then conduct a visual inspection of the youth to include:

- Mouths (the client shall lift his/her tongue, and moving it around);
- hair;
- neck;
- shoulders;
- outside/inside of arms;
- armpits;
- hands/wrists;
- torso;
- waistline;
- buttocks;
- outside/inside of legs;
- lower abdomen/crotch;
- ankle and;
- feet.

4. Body Cavity Search

a. A body cavity search may only be conducted when:

- There is a high degree of *probable cause* that the youth has contra-band that may jeopardize the health and safety of the client, staff, as well as other clients;
- authorized by a warrant and;
- a strip search has been previously conducted.

b. Only the Location Manager after consultation with the Area Director shall make a determination whether a warrant should be sought authorizing a body cavity search. Should the youth personally remove any items from his/her body a warrant is not required.

c. Only a qualified medical professional shall conduct intrusive body cavity searches. After issuance of the warrant the client shall be transported to a medical facility. The youth shall be under constant supervision while at the medical facility until the body search is completed.

Page 6 of 10

D. *Visitor Searches*

1. Location personnel shall not conduct strip or body cavity searches on any visitor.

2. Location personnel shall inform visitors of the screening process for weapons or other contraband.

3. Location personnel shall use hand-held or walk-through metal detectors, whenever available, to screen all visitors other than department personnel and persons approved by the Location Manager/designee.

4. All metal detectors alarms shall require the removal of all personnel property to include metal objects from the visitor's person into a holding basket. This procedure

shall be completed by the visitor and not by location personnel.

5. Visitors shall pass through walk-through metal detectors or be swept by hand held metal detectors for a second time.

6. After a second alarm location personnel shall use hand-held metal detectors when possible to determine the specific area of alarm.

7. Visitors shall be denied admittance to a location if the object triggering an alarm cannot be located or visitors refuse to reveal the object.

8. Location personnel shall not touch visitors with metal detectors.

9. Location personnel shall also conduct a parcel search.

10. Frisk searches shall be conducted on visitors only if no metal detector is available.

11. When possible screenings shall be conducted by personnel of the same sex as the client.

12. Visitors found in possession of weapons or other contraband shall be denied admittance to the location. Law enforcement officials shall be contacted at the discretion of location personnel.

13. Location personnel shall deny admittance to any visitors refusing to be screened by metal detectors or submitting to a frisk or parcel search.

E. *Vehicle Searches*

Transporting personnel shall thoroughly search all vehicles in accordance to Department transportation policies.

F. *Contraband*

1. Locations shall consider the following items as contraband:
 a. all items that can be used or construed as weapons including guns, knives, clubs, or incendiary devices;
 b. drugs, alcohol, and all other illegal substances and associated paraphernalia;
 c. gang-related materials (i.e. clothing, written materials) and;
 d. all other items that locations deem inappropriate or threaten the safety and security of the location.

2. Notification and Documentation
 a. Location managers shall ensure that location personnel document all location, client, visitor, and vehicle searches in the operations log.
 b. Location Managers shall ensure that clients and staff are aware of all items classified as contraband.
 c. Documentation shall include the following if contraband is not discovered;:
 ● type of search;
 ● date and time of search and;
 ● name of personnel conducting search and signature.
 d. Location personnel shall turn over all confiscated contraband to the Location Manager.
 e. Location Managers shall immediately notify local police when the contraband discovered is a firearm. They shall request that the police immediately come to the location to take custody of the firearm. The Location Manager shall also notify Area Director an CIC.
 f. The Location Manager shall notify the following when the confiscated contraband that is illegal and is not a firearm:

● Area Director;

● General Counsel and;

● CIC.

g. The Location Manager/designee shall complete the following for confiscated contraband other than a firearm:

● package the item(s) securely;

● Document the information in the Contraband Chain of Custody Form and;

● Document the discovery in an incident report.

Page 8 of 10

h. The contraband package shall be labeled with the following:

● location;

● name of client/s involved;

● identity of the contraband;

● name of personnel who discovered the item/s and;

● date, time, and place of discovery.

i. In situations involving the confiscation of a firearm the Location Manager shall complete an incident report and submit the report to the General Counsel's Office within 24 hours of the event.

● Additionally when applicable, contraband description shall include but is not limited to the serial number, description, or other identifier, this information shall be documented in the incident report and Contraband Chain of Custody Form.

j. In situations involving the confiscation of contraband in the community a copy of the completed contraband chain form shall be forwarded to the attention of the Director of Community Operations. The Director of Community Operations shall maintain a database regarding confiscated contraband. This database shall be forwarded via email to the Deputy Commissioner.

3. Storage

a. Location Manager shall store a confiscated firearm in a locked closet, filing cabinet, safe, or gun locker in his/her office and keep the door to the office locked while waiting for the police to arrive. Location Managers shall never move farther away from their office door than direct eyesight while waiting for police.

b. All other contraband shall be stored in a separate locked file cabinet or safe, accessible only by the Location Manager.

c. The Location Manager/designee is responsible for securing the key or combination for each locked closet, filling cabinet, safe, or gun locker that is used to store contraband.

d. Contraband other than a firearm shall be stored for up to 10 days if not transferred to another criminal justice agency.

e. Illegal contraband and contraband being held as evidence in an investigation shall be given back to the parent/guardian. All other confiscated contraband other than illegal contraband may be given to the parent/guardian.

Page 9 of 10

4. Transfer

a. The Location Manager shall sign and request that police sign the operations log and Chain of Custody Form to verify policy custody of a firearm or other illegal contraband and whether or not the client in possession of the firearm or illegal contraband was taken into police custody.

b. Location Managers shall issue and/or receive signed receipts for all transactions involving contraband items.

5. Disposal

a. The Location Manager/designee shall contact local law enforcement agencies and establish a protocol for disposing of contraband.

b. The Location Manager may dispose of contraband after the 10–day limit. Disposal shall be witnessed by one other staff-member and documented in the operations log.

Page 10 of 10

*OUTCOME MEASURES/PERFORMANCE INDICATORS*

- *Location searches (inside and outside) are conducted on a regular basis.*

- *Clients in a secure facility returning from an outside activity are subject to searches.*
- *All visitors are subjected to metal detection screening or frisk and parcel searches prior to entering a location.*
- *All location personnel are trained in proper search techniques to include the use of metal detectors, frisk, and strip searches.*
- *All locations have a list of items considered contraband.*
- *A secure storage area for contraband is maintained at all locations.*
- *Reports of contraband found within locations are decreased.*
- *Police are immediately notified to take custody of a firearm when one is discovered or confiscated by location personnel.*
- *Documentation is maintained for all searches and located contraband.*

DEPARTMENT OF YOUTH SERVICES
CONTRABAND CHAIN OF CUSTODY FORM

Staff: _____ Title: _____ Date: _____
Name of Client(s) Involved _____
 _____
 _____
 _____

Description and Quality of Contraband _____
_____
_____

**Chain of Custody**
1. Staff (discovering contraband) _____ Date: ____Initials____
 Passed On (date) _____ To the following:
2. Name: _____ Title: _____ ____Initials
 Passed On (date) _____ To the following:
3. Name: _____ Title: _____ ____Initials
 Passed On (date) _____ To the following:
 Name: _____ Title: _____ ____Initials